**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| City of Pontiac General Employees Retirement System, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>First Solar Incorporated, et al.,<br><br>Defendants. | No. CV-22-00036-PHX-MTL<br><br>**ORDER** |

The matter is before the Court on Defendants First Solar, Inc. ("First Solar"), Mark Widmar, Alexander R. Bradley, and Georges Antoun's ("Individual Defendants" and together with First Solar, "Defendants") Motion to Dismiss Plaintiff's Amended Complaint (Doc. 17). Lead Plaintiffs Palm Harbor Special Fire Control & Rescue District Firefighters' Pension Plan and Greater Pennsylvania Carpenters' Pension Fund (collectively "Plaintiffs") have filed a response in opposition (Doc. 21), and Defendants have filed a reply (Doc. 22). The Court held oral argument on the Motion. (Doc. 28). For the following reasons, the Court dismisses the Amended Complaint.

**I.     BACKGROUND[1]**

Plaintiffs bring this putative class action for violations of federal securities laws on behalf of themselves and a putative class of all persons and entities who purchased or

---

[1] The background section is based on the Amended Complaint, the well-pleaded factual allegations are taken as true solely for the purposes of ruling on the instant motion to dismiss, and on documents the Amended Complaint incorporates by reference or that are otherwise subject to judicial notice. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

otherwise acquired First Solar's common stock between February 22, 2019 and February 20, 2020 (the "Class Period"). (Doc. 15 at 1.) Plaintiffs are two pension funds that purchased or otherwise acquired First Solar common stock at allegedly artificially inflated prices during the Class Period. (Doc. 15 ¶¶ 29, 30.)  Defendant First Solar is a publicly traded Delaware corporation headquartered in Tempe, Arizona that manufactures and sells solar module and photovoltaic ("PV") solar power systems for commercial and residential applications. (*Id.* ¶¶ 1, 31.) First Solar's common stock trades on the Nasdaq under the ticker symbol "FSLR." (*Id.* ¶ 31.) The Individual Defendants all serve managerial roles for First Solar. Mark Widmar has served as First Solar's Chief Executive Officer since July 2016. (*Id.* ¶ 32.) Alexander R. Bradley has served as the company's Chief Financial Officer since October 2016. (*Id.* ¶ 33.) And Georges Antoun has served as First Solar's Chief Commercial Officer since July of 2016. (*Id.* ¶ 33.)

Plaintiffs' allegations of fraud concern two of First Solar's business segments: (1) the PV solar power Modules Segment (the "Modules Segment") and (2) the PV solar power Systems Segment (the "Systems Segment"). (*Id.* ¶ 2.) During the Class Period, First Solar was the world's largest manufacturer of thin-film solar PV modules. (*Id.* ¶ 47.) The Modules Segment was tasked with manufacturing these solar panels and First Solar primarily sold these modules to integrators and operators of PV solar power systems.[2] Before the start of the Class Period, First Solar's Modules Segment primarily manufactured and sold its Series 4 solar module. (*Id.* ¶ 49.) The Series 4 replacement was announced at the end of 2016 when First Solar declared that it would be transitioning to its new solar module, the Series 6. (*Id.* ¶ 50.) This new Series 6 solar module was to be larger and more powerful than the outgoing Series 4. (*Id.*) First Solar measured the cost efficiencies and power output of its solar modules using various metrics, including cost per watt ("CpW"), the cost incurred in producing one watt of power, and watts per module, the amount of power a module produces expressed in wattage. (*Id.* ¶ 3.) First Solar's Systems Segment

---

[2] Solar modules can be used individually, but several may be connected to form an array. These arrays are then connected to an electrical grid to form a PV solar power system. (Doc. 15 ¶ 47.)

provided customers with turn-key PV solar power systems and included project development, engineering, procurement, construction, operations, and maintenance as part of its service offerings. (*Id.* ¶ 61.) Contained within the Systems Segment, First Solar's project development business would receive rights to construct and operate PV solar power systems for customers. (*Id.* ¶ 63.)

On January 15, 2020, based on data from the Bloomberg New Energy Finance database, Barclays published a report indicating that First Solar's Systems Segment had "lost 80%+ of its U.S. market share." (*Id.* ¶ 128.) Barclays observed that while First Solar once captured "20% of the market," it now only represented "4% of the pipeline" of U.S. solar projects. (*Id.*) Following the publication of Barclays' report, First Solar's stock declined approximately 7% from a close of $58.78 per share on January 14, 2020, to a closing price of $54.75 per share on January 15, 2020. (*Id.* ¶ 138.) Thereafter, on February 20, 2020, during the company's Q4 earnings call, First Solar announced that it was exploring a sale of its project development business. (*Id.* ¶ 141.) On that same call, First Solar announced that it was experiencing "challenges with regard to certain aspects of the overall cost per watt[,]" that it would not realize its fleet-wide CpW targets, and that its Series 6 solar module was falling short of its watt per module power targets. (*Id.* ¶¶ 119, 120.) Following this announcement, First Solar's common stock declined from a close of $59.32 per share on February 20, 2020, to a close of $50.59 per share on February 21, 2020. (*Id.* ¶ 122.)

Plaintiffs brought this action alleging that Defendants made misrepresentations and omissions relating to First Solar's Modules Segment and Systems Segment in violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. (*Id.* ¶ 25.) Defendants have moved to dismiss the Amended Complaint with prejudice pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u *et seq.* ("PSLRA"). (Doc. 17 at 2.)

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it contains "factual content that allows the court to draw the reasonable inference" that the moving party is liable. *Id.* At the pleading stage, the Court's duty is to accept all well-pleaded complaint allegations as true. *Id.* Facts should be viewed "in the light most favorable to the non-moving party." *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013). "[D]ismissal is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011).

Securities fraud suits face heightened pleading standards. "At the pleading stage, a complaint stating claims under section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the [PSLRA]." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

> Because allegations of fraud inescapably carry a degree of moral turpitude, Rule 9(b) imparts a heightened note of seriousness, requiring a greater degree of pre-discovery investigation by the plaintiff, followed by the plaintiff's required particular allegations, thereby protecting a defendant's reputation from frivolous and unfounded allegations and permitting a particularized basis for a defendant to respond to the particularized allegations.

*Irving Firemen's Relief & Ret. Fund v. Uber Technologies, Inc.*, 998 F.3d 397, 404 (9th Cir. 2021) (citation omitted). Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). In so doing, the PSLRA "prevents a

plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (emphasis in original).

## III. DISCUSSION

### A. Section 10(b)

To state a claim under Section 10(b) of the Securities Exchange Act of 1934, a plaintiff must sufficiently allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 786 (9th Cir. 2020). Each of these elements must be independently satisfied. *See Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (reasoning that failure to adequately plead an element constitutes "an independent basis" on which to affirm dismissal of a securities fraud complaint). As explored below, Plaintiffs fail to meet their pleading standards as to loss causation and scienter.

#### 1. Loss Causation

Plaintiffs in securities fraud suits "must plead and ultimately prove that the defendant's wrongful conduct caused the plaintiff's injury." *In re BofI Holding*, 977 F.3d at 789. In enacting the PSLRA, Congress codified the requirement that securities fraud plaintiffs "shall have the burden of proving that the act or omission of the defendant alleged to violate [the law] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). "Typically, to establish loss causation, a plaintiff must show that the defendants' alleged misstatements artificially inflated the price of stock and that, once the market learned of the deception, the value of the stock declined." *Irving Firemen's Relief & Ret. Fund*, 998 F.3d at 407 (citing *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119-20 (9th Cir. 2013)). This is known as the "fraud-on-the-market" theory. *Nuveen*, 730 F.3d at 1120. To advance this theory, "the plaintiff

must show that after purchasing her shares and before selling, the following occurred: (1) the truth became known, and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding*, 977 F.3d at 789. "The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *Id.* at 790 (citing *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018) (per curiam)). Corrective disclosures occur "when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.* (quoting 15 U.S.C. § 78u-4(e)(1)).

While determining what constitutes a corrective disclosure "has proved more challenging than might have been expected, a few basic ground rules can be sketched out." *In re BofI Holding*, 977 F.3d at 790. Corrective disclosures do not require "an admission of fraud by the defendant or a formal finding of fraud by a government agency." *Id.* (citing *Metzler*, 540 F.3d at 1064). Rather, a corrective disclosure can "come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters." *Id.* (citation omitted). Also, corrective disclosures "need not reveal the full scope of the defendant's fraud in one fell swoop; the true facts concealed by the defendant's misstatements may be revealed over time through a series of partial disclosures." *Id.* (citation omitted). While corrective disclosures "need not precisely mirror the earlier misrepresentation, [they] must at least relate back to the misrepresentation and not to some other negative information about the company." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1207-08 (9th Cir. 2020) (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016)).

Plaintiffs allege that the truth of Defendants' supposed fraud was revealed to the market through two corrective disclosures. (Doc. 15 ¶ 180.) First, Plaintiffs allege that the January 15, 2020 Barclays report revealed the alleged Systems Segment fraud. (*Id.* ¶¶ 181-187.) Second, Plaintiffs assert that First Solar's February 2020 earnings call revealed the truth about the company's Modules Segment and further revealed the truth that First Solar was exploring a sale of its project development business. (*Id.* ¶¶ 188-195.) For the

following reasons, the Court finds that neither of these disclosures are corrective for purposes of the loss causation inquiry.

### a. The January 15, 2020 Barclays Report

Plaintiffs assert that the Barclays report uncovered the truth "about the diminishing market share commanded by First Solar's Systems Segment . . ." (*Id.* ¶ 182.) Specifically, the report revealed that while First Solar's Systems Segment had once held 20% of the market, it now reflected merely 4% of the development pipeline. (*Id* ¶ 183.) Plaintiffs argue the report corrected Defendants' misstatements about their project development business. (*Id.* ¶ 183.) Defendants argue that the Barclays report cannot serve as a corrective disclosure because the Complaint does not plead a single alleged misstatement relating to market share. (Doc. 17 at 7.) Further, Defendants contend that the report revealed nothing about First Solar's statements relating to its "potential" or "targeted" systems bookings. (*Id.*) Plaintiffs agree that the Barclays report focused on First Solar's dwindling market share but respond that this information directly related to Defendants' statements about the robustness of the development business' pipeline. (Doc. 21 at 20.) That is, Plaintiffs maintain that the statements about the Systems Segment business' "robust" pipeline necessarily implicated the company's market share. (*Id.*) Thus, Plaintiffs claim that the Barclays report on market share constitutes a corrective disclosure.

The Amended Complaint alleges numerous misrepresentations and omissions regarding First Solar's project development business contained within its Systems Segment. (*See* Doc. 15 ¶¶ 157-159, 161-162, 164, 166, 168, 170, 172, 174-176, 178.) Notably, none of these statements relate to First Solar's market share. Furthermore, these statements do not "necessarily implicate" the company's existing market share. Plaintiffs' loss causation argument conflates First Solar's existing share of systems projects (i.e., market share) with potential business growth opportunities (i.e., the pipeline). One relates to the share of existing projects and the other to new opportunities. The Barclays report says nothing that calls into question the validity of Defendants' statements regarding potential business opportunities. Therefore, the Court finds that the Barclays report does

1  not relate back to any alleged misrepresentation regarding First Solar's Systems Segment. Instead, the Barclays report merely revealed the negative news that First Solar's Systems Segment had lost 80% of its market share. *See Grigsby*, 979 F.3d at 1207-08 (stating that, to be corrective, a disclosure "must at least relate back to the misrepresentation and not to some other negative information about the company"). As a result, the January 15, 2020 Barclays report cannot constitute a corrective disclosure.

### b.   The February 20, 2020 Earnings Call

Plaintiffs next assert that First Solar's earnings call held on February 20, 2020 was a corrective disclosure that caused the truth about the Modules Segment to become known to the market. (Doc. 15 ¶¶ 188-195.) More precisely, Plaintiffs contend that Defendants' disclosure of the failure to achieve the 2019 CpW target, the Series 6's failure to hit its 460 watt per module midterm target, and First Solar's exploration of a sale of its project development business corrected earlier misstatements and omissions. (*Id.*) Defendants maintain that this earnings call cannot be a corrective disclosure because the call did not disclose "anything about the allegedly concealed electrical, output, packaging and shipping problems" and because First Solar "already had disclosed the very same allegedly corrective information months earlier, in [an] October 24, 2019 earnings call." (Doc. 17 at 8.) Defendants further argue that First Solar's announcement that it was contemplating a divestiture of the project development business does not relate to any alleged misrepresentation and that First Solar had no obligation to disclose its contemplated business plans. (Doc. 22 at 6.) Plaintiffs respond that the February 20, 2020 "revelations were causally related to Defendants' misrepresentations and omissions concerning the Series 6." (Doc. 21 at 20.) Plaintiffs also claim that the information was not already disclosed to the market because the October 2019 earnings call merely warned that the Series 6 module would fall short of its targets whereas the February 2020 call confirmed as much.[3]

---

[3] For the first time in their response to Defendants' Motion, Plaintiffs summarily claim that both the January 15, 2020 Barclays report and the February 20, 2020 earnings call establish loss causation under a materialization-of-the-risk theory. (Doc. 21 at 21.) Under this theory, loss causation may be established by showing that "misstatements and omissions concealed

The February 20, 2020 earnings call cannot constitute a corrective disclosure. Plaintiffs allege that the call disclosed the truth of First Solar's failure to achieve its 2019 CpW target. (Doc. 15 ¶ 188.) But First Solar previously disclosed that very information on an October 19, 2019 earnings call. On the October 2019 call, First Solar disclosed that on a fleet-wide basis it would "exit the year approximately $0.005 higher than [the CpW] target [it] set at the beginning of the year." (Doc. 18-9 at 7.) This information was essentially reiterated on February 2020 call when First Solar stated: "[On the October 2019 call], we forecast that our fleet-wide cost per watt to end the year approximately $0.005 higher than the internal target we set at the beginning of the year, which is where our fleet costs actually ended the year." (Doc. 18-12 at 11.) Plaintiffs argue that the February 2020 earnings call provided new information to the market by confirming what the company had merely warned about in October of 2019. (Doc. 21 at 21.) But "[b]ecause publicly available information in an efficient market is generally reflected in the price of a security, the disclosure of confirmatory information—or information already known by the market—will not cause a change in stock price." *Grigsby*, 979 F.3d at 1205 (citing *Myer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013)). Furthermore, to be corrective, a disclosure "must by definition reveal new information to the market that has not yet been incorporated into the price [of the stock]." *In re BofI Holding*, 977 F.3d at 794. The market already knew that First Solar would exit the 2019 financial year missing its internal CpW target by approximately $0.005 when the February 2020 earnings call took place. Therefore, the February 2020 earnings call cannot be a corrective disclosure.

Plaintiffs further contend that the February 2020 earnings call revealed a different truth to the market, that First Solar was "well short of its 460 watt per module midterm

---

the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value' of a security." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013). But the Ninth Circuit has not adopted this theory. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 n.6; *see also Magro v. Freeport-McMoran Inc.*, No. CV-16-00186-PHX-DJH, 2018 WL 3725781, at *9 (D. Ariz. Aug. 3, 2018). In any event, the Court will not consider this argument because the Amended Complaint lacks any particularized allegations that Defendants concealed a price-volatility risk—or some other risk—that materialized and played some part in diminishing the market value of First Solar's stock.

target." (Doc. 15 ¶ 190.) But these allegations fall prey to same deficiency above. On the October 2019 earnings call, First Solar disclosed that its "top production bin is 435 watts" and that a sample module had achieved a "447 watts peak . . . a new world record." (Doc. 18-9 at 6.) First Solar stated the same on the February 2020 earnings call: "Today, our highest volume bin is 435 watts" and "we have certified a record production module of 447 watts." (*Id.*) Thus, the information about the Series 6 power output was already known by the market – preventing the February 2020 from serving as a corrective disclosure.

Plaintiffs finally contend that the February 2020 call served as a corrective disclosure providing the market with the truth that First Solar was exploring a sale of its project development business. (Doc. 15 ¶¶ 191, 192.) As Defendants note, however, the Amended Complaint fails to connect this disclosure to any alleged misrepresentation or omission. Plaintiffs allege that, on the February 2020 call, Defendant Widmar revealed that First Solar was exploring a sale of the project development business and "admitted that the Project Development business had been negatively impacted by competition." (*Id.* ¶ 192.) But the Amended Complaint provides no connection between the disclosure that the project business suffered negative impact caused by competition and any alleged misstatement or omission. As a result, the Amended Complaint fails to adequately plead loss causation related to the February 2020 earnings call.

### 2. Scienter

Securities fraud lawsuits require a showing of scienter, i.e., an intent to defraud. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) (explaining that scienter refers to the mental state embracing an intent to deceive, manipulate, or defraud). "Mere negligence—even head-scratching mistakes—does not amount to fraud." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1103 (9th Cir. 2021). Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud." In enacting the PSLRA, Congress extended Rule 9(b)'s particularity requirement to allegations of scienter. Therefore, to adequately plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the

required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To support a strong inference of scienter, a complaint must allege that a defendant made false or misleading statements with an "intent to deceive, manipulate, or defraud," or with deliberate recklessness. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017). "Deliberate recklessness is not *mere* recklessness." *Prodanova*, 993 F.3d at 1106 (internal marks and citation omitted) (emphasis in original). Rather, it is "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*

These standards "present no small hurdle for the securities fraud plaintiff." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (citation omitted); *see also Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) ("The PSLRA's strong inference requirement has teeth. It is an exacting pleading obligation.") (cleaned up). The Court must "engage in a comparative evaluation [and] . . . consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Plaintiffs argue that the Amended Complaint adequately alleges scienter. (Doc. 21 at 16.) First, they argue that Defendants' knowledge of or access to contrary information establishes scienter. (*Id.* at 16-17.) Next, they argue that the Series 6 and the project development business were First Solar's core operations. (*Id.* at 21.) Finally, Plaintiffs claim that Defendants were financially motivated to misrepresent and conceal material information from investors. (*Id.*) As explained below, the Court finds that Plaintiffs' Amended Complaint does not pass muster under the PSLRA.

        **a.**      **Access to Information**

Plaintiffs generally allege that the Individual Defendants had "unfettered access to

detailed information concerning the issues with the Series 6 Modules, as well as the Project Development business's dwindling market share and [divestiture exploration]." (Doc. 15 ¶ 196.) The Amended Complaint provides that the Individual Defendants were "directly involved in and participated in both the management and day-to-day operations of the Company at its highest levels." (*Id.*) Plaintiffs point to former employees who report the Individual Defendants' presence at company town-hall-style meetings at undisclosed times between 2018 and 2021. (*Id.* ¶¶ 110-112, 198; *see also* Doc. 21 at 17.) At these meetings, Defendants allegedly discussed the problems with the Series 6 and project development business. (Doc. 21 at 17.) Also, Plaintiffs allege that the Individual Defendants knew about or had access to information regarding problems with the Series 6 module and project development business because "they reviewed or had access to information detailing the Series 6 problems." (*Id.*) The Amended Complaint finally provides that First Solar stopped bidding on development projects during 2019 and that it began laying off project development personnel in the first half of 2019. (Doc. 15 ¶¶ 132-134, 136.)

These allegations fail to meet the heightened pleading standards governing securities fraud suits. Firstly, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter – at least absent some additional allegation of specific information conveyed to management and related to the fraud." *Metzler*, 540 F.3d at 1068. The Amended Complaint generally alleges that the Individual Defendants, by virtue of their status as "upper management" must have known. (*Id.* ¶ 116.) This is insufficient. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Where a complaint relies on allegations that management had an important role in the company but does not contain additional detailed allegations about the defendants' actual exposure to information, it will usually fall short of the PSLRA standard."). The Amended Complaint also fails to specify the substance and timing of any information supposedly passed on to First Solar's "C-Suite." Merely alleging that the Individual Defendants reviewed documents is insufficient. *See Lipton v. Pathogensis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (reasoning that an adequate "complaint which

purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability"). Importantly, Plaintiffs also fail to differentiate between Defendants and do not link any of the allegations regarding internal reports to any specific Defendant. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000 (9th Cir. 2009) *as amended* (Feb. 10, 2009) (holding "allegations that senior management . . . closely reviewed the accounting number generated . . . each quarter, and that top executives had several meetings in which they discussed quarterly inventory numbers" to fall short of establishing a strong inference of scienter); *see also Or. Pub. Emps. Ret. Fund*, 774 F.3d at 607 (requiring plaintiffs to "allege scienter with respect to each of the individual defendants").

Plaintiffs' use of former employee reports is similarly unavailing. The Amended Complaint generally alleges that former employees confirmed that the Individual Defendants were "provided information or had access to information specific to the Series 6 problems." (Doc. 15 ¶ 113.) But negatively characterizing "reports relied on by insiders, without specific reference to the contents of those reports, [is] insufficient." *Id.* And "[m]ere access to reports . . . is insufficient." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014).

b. **Core Operations Doctrine**

Plaintiffs attempt to infer scienter through the "core operations" doctrine. (Doc. 15 ¶ 201.) This theory "relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Intuitive Surgical, Inc.*, 759 F.3d at 1062. Core operations may support a strong inference of scienter under three circumstances:

> First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances

> where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

*S. Ferry LP, No. 2*, 542 F.3d at 785-86 (internal marks omitted). "Proof under this theory is not easy." *Intuitive Surgical, Inc.*, 759 F.3d at 1062. To successfully allege scienter under this theory, "a plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.*

The Amended Complaint's single paragraph alleging scienter under the core operations doctrine does not meet these standards. For one, nowhere in the Amended Complaint is there any alleged specific admission by any of the Individual Defendants of detailed involvement in the minutia of First Solar's operations. Instead, the Amended Complaint simply alleges that the Modules Segment and the project development business within the Systems Segment "were among First Solar's chief revenue generators during the Class Period." (Doc. 15 ¶ 201.) Moreover, Plaintiffs fail to provide witness accounts demonstrating that the Individual Defendants had actual involvement in creating false reports. One former employee alleges that the "Company's C-Suite" would have reviewed and approved certain slides "discussing the problems with the modules in the field." (*Id.* ¶ 114.) But as explored above, while "witness declarations can support an inference of scienter . . . to do so, they must provide specific facts showing a connection between the false statement and the mindset of the person who made it." *Prodanova*, 993 F.3d at 1110. The former employee's account falls short of meeting these requirements.

### c.     The Executive Performance Equity Plan

Plaintiffs next allege that the Individual Defendants had a "strong motive to conceal the issues with the Series 6" because of their participation in an "Executive Performance Equity Plan." (Doc 15 ¶ 202.) First Solar's Schedule 14A proxy statement filed with the Securities and Exchange Commission describes the Executive Performance Equity Plan as

"a long-term incentive program for key executive officers and associates . . . intended to reward the achievement of performance objectives that align with our long-term strategic plans, including continued execution of our Series 6 module technology." (*Id.*) The Amended Complaint further provides that First Solar's plan is "intended to represent the largest component of [the Company's] executives' potential compensation, [and is] based on four performance metrics, including [the] Series 6 cost per watt produced [and] Series 6 watts per module." (*Id.*)

Plaintiffs' allegations relating to the Executive Performance Equity Plan fail to raise a strong inference of scienter. "[A]llegations of routine corporate objectives" are not sufficient to allege scienter. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012). "If simple allegations of pecuniary motive were enough to establish scienter, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Zucco Partners*, 552 F.3d at 1005 (internal marks and citation omitted). The Amended Complaint ignores that "it is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals." *In re Rigel Pharms.*, 697 F.3d at 884. Plaintiffs make no particularized allegations describing the bonuses awarded to any of the Individual Defendants during the Class Period or comparing the bonuses to those awarded in prior years. *See Zucco Partners*, 552 F.3d at 1005 (rejecting scienter allegations where "the complaint fails to provide specifically, with comparisons to prior year bonuses, the correlation [between executive compensation] and the bottom line"). The bare assertion that the Individual Defendants were financially motivated to defraud because their executive-level bonuses were based in part on the execution of the Series 6 module technology does not present a strong inference of scienter.

### d. Stock Sales

Plaintiffs finally allege that the Individual Defendants realization of "substantial benefits from their personal sales of First Solar stock" during the Class Period raises a strong inference of scienter. (Doc. 15 ¶¶ 203-210.) Plaintiffs claim that Defendants

Widmar, Antoun, and Bradley's sales of First Solar stock were "suspiciously timed to take advantage of the price of First Solar's stock, before the truth about the Series 6 and Project Development was revealed." (*Id.* ¶¶ 205, 208, 210.) While "unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter, insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco Partners*, 552 F.3d at 1005 (internal marks and citation omitted). Courts consider three factors in determining whether stock sales raise a strong inference of deliberate recklessness establishing scienter: "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (quoting *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).

The stock sale allegations fail to raise a strong inference of scienter. Firstly, the Amended Complaint falls short of providing a "meaningful trading history for purposes of comparison to the stock sales within the class period" as to any Individual Defendant. *Id.* Plaintiffs allege that the Individual Defendants sold three times the number of shares of First Solar stock in 2019 when compared to 2018. (Doc. 15 ¶¶ 206, 208, 210.) But these unparticularized allegations leave the Court guessing as to the overall holdings of the Individual Defendants prior to the Class Period and whether the Class Period sales are dramatically inconsistent with prior trading history. Next, as to Widmar and Bradley, the Amended Complaint ignores that their overall holding of First Solar stock actually increased during the Class Period. While Widmar and Bradley sold 138,977 and 29,173 shares, respectively (Doc. 15 ¶¶ 32-33), they both acquired more shares than they sold – Widmar acquired 162,000 shares and Bradley 38,000 shares. (*See* Doc. 18-13 at 2-6, 17-20.)[4] This strongly negates an inference of scienter. *See Applestein v. Medivation, Inc.*, 861

---

[4] "A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (citation omitted). Plaintiffs do not dispute the underlying facts forming the basis of the Form 4. As such, The Court takes judicial notice of the Mr. Widmar and Mr. Bradley's First Solar stock trading history contained in Defendants' SEC Form-4: Statement of Changes in Beneficial Ownership. (Doc. 18-13.)

F. Supp. 2d. 1030, 1043 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014) (finding that "substantially [increasing] stock holdings during the Class Period" gives "rise to a strong inference that Defendants did not act with scienter"). The Court finds that the net gain of shares during the class period cuts against Plaintiffs' theory that Widmar and Bradley were financially motivated to conceal information from investors.

Defendants argue that Plaintiffs' suspiciously timed stock sale allegations are undercut by the fact that the relevant stock sales were executed pursuant to Rule 10b5-1 trading plan. A Rule 10b5-1 plan "allows for stock sales over a predetermined period without concern for the market." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 n.2 (9th Cir. 2017). "Sales according to pre-determined plans may rebut an inference of scienter." *Metzler*, 540 F.3d at 1067 n.11 (internal marks and citation omitted). Plaintiffs argue that Widmar and Antoun's Rule 10b5-1 plans do not rebut an inference of scienter since the plans were formed during the Class Period. (Doc. 21 at 19.) While it is true that a Rule 10b5-1 plan initiated during a class period will do less to shield a defendant from suspicion, such plans may still "mitigate any inference of improper motive surrounding [stock] sales." *Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874, 891 (4th Cir. 2014). As previously explained, the Amended Complaint does not provide sufficient detail regarding previous stock transactions for the Court to analyze whether the trades were dramatically out of line with prior trading practices. Furthermore, "[o]fficers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures." *Lipton*, 284 F.3d at 1037. Viewed holistically, the lack of meaningful prior trading information, the net increase of stock holdings, the existence of Rule 10b5-1 trading plans, and the routine nature of stock trades following earnings calls all rebut a strong inference of scienter.

### B.      Section 20(a)

Section 20(a) of the Securities Exchange Act of 1934 "imposes liability on certain controlling individuals . . . for violations of section 10(b) and its underlying regulations." *Prodanova*, 993 F.3d at 1113 (internal marks and citation omitted). To state a claim of

control person liability under section 20(a), a plaintiff must demonstrate "a primary violation of federal securities law" and that "the defendant exercised actual power or control over the primary violator." *Zucco Partners*, 552 F.3d at 990. As explored above, Plaintiffs failed to adequately plead a primary violation of section 10(b). Therefore, the section 20(a) control person claim necessarily fails. *See id.* ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

### C. Leave to Amend

Plaintiff's response to the Motion to Dismiss does not request leave to amend. Upon the Court's inquiry at oral argument, however, Plaintiff's counsel requested leave to amend in the event the Court grants the Motion. First Solar opposes the request and argues that the Court should dismiss the case with prejudice.

District courts "shall grant leave to amend freely 'when justice so requires.'" *Lopez v. Smith*, 302 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting Fed. R. Civ. P. 15 (a)). Courts in the Ninth Circuit are to apply this policy "with extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). To that end, "a district court should grant leave to amend even if no request to amend the pleading was made . . ." *Lacey v. Maricopa Cnty.*, 639 F.3d 896, 926 (9th Cir. 2012) (internal marks and citation omitted). The Court, however, "may in its discretion deny leave to amend due to undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies . . . , undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of amendment." *Zucco Partners*, 552 F.3d at 1007 (internal marks and citation omitted). Absent a "strong showing of any of [these] factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

It is not clear to the Court that any further amendment to Plaintiffs' Amended Complaint would be futile. *See Eminence Capital*, 316 F.3d at 1052 (reasoning that dismissal with prejudice and "without leave to amend is not appropriate unless it is clear

on de novo review that the complaint could not be saved by amendment"). And, at oral argument, Plaintiffs' counsel suggested that they could provide more detailed complaint allegations. Plaintiffs will be granted leave to file a Second Amended Complaint.

## IV. CONCLUSION

The allegations in Plaintiffs' Amended Complaint, taken together, fall short of adequately alleging a violation of section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. The Amended Complaint fails to meet the PSLRA's exacting standards and requirements for pleading loss causation and scienter. As a result, the Amended Complaint must be dismissed.

Accordingly,

**IT IS ORDERED granting** Defendants' Motion to Dismiss Plaintiffs' Amended Complaint (Doc. 17).

**IT IS FURTHER ORDERED** dismissing Plaintiffs' Amended Complaint (Doc. 15) with leave to amend. Plaintiffs may file a Second Amended Complaint by February 10, 2023.

Dated this 10th day of January, 2023.

Michael T. Liburdi
United States District Judge