Andrew S. Friedman (005425)
**BONNETT FAIRBOURN FRIEDMAN & BALINT, PC**
2325 East Camelback Road, Suite 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
afriedman@bffb.com

*Liaison Counsel for Lead Plaintiffs and the Proposed Class*

[Additional Counsel appear on signature page.]

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Palm Harbor Special Fire Control & Rescue District Firefighters' Pension Plan; and Greater Pennsylvania Carpenters' Pension Fund, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>First Solar, Inc.; Mark Widmar; Alexander R. Bradley; and Georges Antoun,<br><br>Defendants. | Case No. CV-22-00036-PHX-MTL<br><br><u>CLASS ACTION</u><br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 1

II. JURISDICTION AND VENUE ..... 9

III. PARTIES ..... 9

- A. Lead Plaintiffs ..... 9
- B. Defendants ..... 10
  - 1. First Solar ..... 10
  - 2. The Individual Defendants ..... 10
- C. Certain Relevant Non-Parties ..... 11
  - 1. First Solar Executives ..... 11
  - 2. Former Employees ..... 11

IV. FACTUAL ALLEGATIONS ..... 12

- A. First Solar's Class Period Business Model ..... 12
  - 1. The Modules Segment ..... 13
  - 2. The Systems Segment ..... 17
  - 3. First Solar's Vertically Integrated Business Model ..... 19
  - 4. Relevant First Solar Projects ..... 21
- B. Defendants Fraudulently Conceal Issues With the Series 6 ..... 22
  - 1. The Series 6 Suffers from Significant, Undisclosed Manufacturing and Reliability Problems ..... 22
    - a. Output Problems ..... 23
    - b. Electrical Problems ..... 24
    - c. Broken Modules ..... 27
  - 2. Defendants Knew of or Recklessly Disregarded the Undisclosed Problems Related to the Series 6 During the Class Period ..... 27
    - a. Attendance at and Participation in Town Hall Meetings ..... 28
    - b. Reporting on Series 6 Issues ..... 28

3. Defendants Misleadingly Affirm That the Series 6 Was Meeting Its Wattage and Cost Reduction Targets ... 29

C. Defendants Misrepresent the Health and Prospects of the Project Development Division and Conceal Their Plans for Its Elimination ... 32

1. Defendants Knew the Project Development Business Lost Nearly All Its Market Share and Made Plans to Exit the Business ... 32

2. Defendants Mislead Investors By Touting the Strength of the Project Development Pipeline ... 35

D. The Relevant Truth Regarding the Series 6 and Project Development Business Slowly Emerges ... 36

1. October 24, 2019—The Truth Regarding the Series 6 Begins to Emerge, But Defendants Continue to Mislead Investors About the Entire Story ... 36

2. January 15, 2020—Investors Begin to Learn the Truth Regarding First Solar's Project Development Business ... 37

3. February 20, 2020—The Full Truth Is Revealed as Defendants Admit That the Series 6 Is Facing Cost Challenges and Discontinue Disclosure of Cost Per Watt Figures, and Disclose a Potential Sale of the Project Development Business ... 39

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ... 41

A. Misrepresentations and Omissions Concerning the Series 6 ... 41

1. February 21, 2019 Earnings Call ... 41

2. August 1, 2019 Earnings Call ... 42

3. October 24, 2019 Earnings Call ... 43

B. Misrepresentations and Omissions Concerning Project Development ... 45

1. February 21, 2019 Earnings Call ... 45

2. May 2, 2019 Earnings Call ... 46

3. August 1, 2019 Earnings Call ... 47

4. September 19, 2019 Press Release ... 48

5. October 24, 2019 Earnings Call ... 49

VI. ALLEGATIONS OF LOSS CAUSATION ... 51

A. October 24, 2019 Earnings Call ... 53

B. January 15, 2020 Barclays Report ........ 54

C. February 20, 2020 Earnings Call ........ 56

VII. ADDITIONAL ALLEGATIONS OF SCIENTER ........ 59

A. Core Operations Allegations: The Series 6 Solar Module and Project Development Business Were Core to the Company's Operations ........ 60

1. The Series 6 Module Accounted for Nearly Half of First Solar's Revenue During the Class Period and Its Success Was Critical to the Company's Future ........ 60

2. The Project Development Business Was a Key Part of the Company's Lauded Vertical Integration Model ........ 61

B. Defendants' Statements Themselves Support Scienter ........ 63

C. Defendants' Knowledge and Reckless Disregard of Misstatements Regarding the "Series 6" Solar Module ........ 66

D. Defendants' Knowledge and Reckless Disregard of Misstatements Regarding Project Development ........ 66

E. The Scienter of the Individual Defendants Is Imputed to First Solar ........ 67

VIII. CLASS ACTION ALLEGATIONS ........ 67

IX. THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES ........ 69

X. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ........ 70

XI. CAUSES OF ACTION ........ 71

COUNT I FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST FIRST SOLAR, DEFENDANT WIDMAR, AND DEFENDANT BRADLEY ........ 71

COUNT II FOR VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST THE INDIVIDUAL DEFENDANTS ........ 73

XII. PRAYER FOR RELIEF ........ 73

XIII. JURY TRIAL DEMANDED ........ 74

Lead Plaintiffs Palm Harbor Special Fire Control & Rescue District Firefighters' Pension Plan and Greater Pennsylvania Carpenters' Pension Fund ("Lead Plaintiffs"), by and through their undersigned counsel, bring this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the common stock of First Solar, Inc. ("First Solar" or the "Company") between February 22, 2019 and February 20, 2020, both dates inclusive (the "Class Period"), and were injured thereby (the "Class").

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, interviews with numerous individuals, including former employees of First Solar, a review of First Solar's public documents, transcripts of conference calls and presentations concerning First Solar, First Solar's filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by First Solar, analyst reports and advisories about the Company, media reports concerning First Solar, and other information obtainable on the Internet. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after Lead Plaintiffs have had a reasonable opportunity to conduct discovery.

## I. INTRODUCTION

1. In the years preceding the Class Period, Defendants realized First Solar's long-term health depended on a sharp transition to an ostensibly more advanced—and cheaper—solar module, the Series 6. Absent this shift, Defendants risked losing an ongoing pricing war with First Solar's competitors, specifically those in China.

2. As a result, Defendants—as well as the investing public, including those financial analysts who covered First Solar—consistently focused on the development of the Series 6, including the Company's progress in achieving interim benchmarks demonstrating increased efficiency and low cost per module.

3. Unbeknownst to the public, however, Defendants struggled—and ultimately failed—to hit those interim benchmarks. Indeed, as told by nine First Solar former employees ("FEs"), the Series 6 suffered serious problems, including modules catching fire and being damaged. In part because of these problems, the Series 6 modules also failed to meet basic wattage requirements, causing a number of First Solar's customers to seek liquidated damages on those unsatisfied contractual obligations.

4. Beyond the obvious importance of the Series 6 to the Company, as well as the fact that Defendants spoke in detail about the modules throughout the Class Period, multiple FEs have confirmed that Defendants knew about these (increasing) problems. Simply by way of example (*see* Section IV.B.2 for a more comprehensive discussion of these FEs and greater details regarding the facts), a former First Solar employee, FE 9—who worked with Defendant Widmar, who was a mentor to him—said that Defendant Widmar knew about the issues with the Series 6 modules.

5. Other FEs confirm that Defendants attended "Town Hall" meetings where Defendants and other high-ranking officers discussed the problems First Solar experienced with the Series 6, and also received and reviewed (or received and chose not to review) reports describing and analyzing those same problems.

6. Despite knowing that the Series 6 was falling short of interim benchmarks (to say nothing of fires, output shortfalls, and disgruntled customers seeking liquidated damages), Defendant Widmar opened the Class Period by downplaying all concerns and telling First Solar investors that "***we're not falling short of any of our contractual obligations*** relative to commitments to the customers ***on any of the product*** which we need to ship to them." This was knowingly false.

7. Simultaneously, in First Solar's project development division ("Project Development")—which Defendants touted as integral to First Solar's lauded vertically integrated business model—the pipeline for this segment had dwindled significantly. Indeed, as Barclays later reported, First Solar's market share for ***new*** U.S.

development projects ***decreased*** markedly in the years before the Class Period: from approximately 15% in 2016 to approximately ***1%*** in 2019.

8. Despite this dwindling market share, Defendants continued touting the strength of First Solar's development business without disclosing any hint that things had gotten so bad that Defendants were secretly winding down the business and exploring a sale as early as late 2018. For example, FE 6 learned in late 2018 or early 2019 that Project Development was being shut down, and FE 2 recalled Defendants leading Town Hall meetings in early 2019 where they discussed plans to dismantle the Project Development segment.

9. Starting on October 24, 2019, and extending through February 20, 2020, however, the market slowly learned that most of what Widmar and the other Defendants told them during the Class Period was false. Indeed, investors finally learned that the Series 6 was falling short of required benchmarks and was not hitting—and would not hit at any time in 2020—the power and cost metrics Defendants consistently touted throughout the Class Period. Moreover, investors learned that contrary to the rosy picture Defendants painted, the Project Development business was failing, and Defendants were exploring a sale of the division.

10. Upon learning of the true nature of the Series 6 and Project Development business, First Solar's share price experienced three substantial stock drops, together totaling a decline of 28%.

11. First Solar was founded in 1999 and is headquartered in Tempe, Arizona. The Company manufactures and sells solar modules and photovoltaic ("PV") solar power systems, providing a vast array of solar power solutions for commercial and residential purposes.

12. During the Class Period, First Solar operated primarily through two business segments: (1) the PV solar power Modules Segment (the "Modules Segment"); and (2) the PV solar power Systems Segment (the "Systems Segment").

13. The Modules Segment involved the manufacture and sale of solar modules designed to convert sunlight into electricity. Customers of the Modules Segment included project developers, system integrators, and operators of renewable energy projects. In late 2017, First Solar announced that it was transitioning to the Series 6 module as its flagship solar panel product, which would phase out the Company's existing Series 4 module. According to the Company, the Series 6 module was designed and expected to be superior to the Series 4 module in two critical respects: (1) greater cost efficiencies, expressed through the "cost per watt" metric; and (2) significantly improved power output, expressed through the "watts per module" metric.

14. Prior to the Class Period, First Solar stated that the Series 6 would result in a 40 percent reduction (i.e., improvement) in cost per watt vis-à-vis the Series 4 module. Even more impressive, the Company represented that the Series 6 would produce an average of 460 watts per module after ramp-up, far surpassing the 125 watts per module capabilities of the Series 4.

15. The Company's second segment, the Systems Segment, was responsible for providing complete PV solar power systems to customers, including: Project Development; Engineering, Procurement, and Construction ("EPC") services; Operation and Maintenance ("O&M") services; and project finance. The Systems Segment sold its services directly to utilities, independent power producers, commercial and industrial companies, and other system owners.

16. The Systems Segment contributed approximately two-thirds of the Company's revenues from customer contracts leading up to the Class Period. As a result, analysts and investors were focused on the "pipeline" for Project Development, which the market viewed as an important indicator of future revenues for the Systems Segment.

17. First Solar kept investors apprised of the status of the pipeline by reporting the approximate size of the Company's new projects in terms of "gigawatts" or "GW" per year. Prior to and during the Class Period, Defendants repeatedly disclosed a target of 1.0 gigawatts per year in new Systems projects, and consistently reported gigawatts per

year in excess of the target. Thus, the message to the market was clear: the Company's Project Development pipeline was robust, stable, and would continue to play a vital role in First Solar's future financial successes.

18. As set forth herein, during the Class Period, Defendants made a series of materially false and misleading statements and omissions touching upon both of the Company's business segments.

19. With respect to the Modules Segment, to start the Class Period, Defendants laid out First Solar's plan to achieve the expected (40%) cost per watt reduction for the Series 6 over the course of 2019. Thereafter, Defendants represented to investors that the Company was hitting the intermediate benchmarks necessary to meet the cost per watt improvement for the Series 6 in 2019, and that it was presently seeing a consistent improvement in the watts per module, which is one of the primary drivers of cost per watt.

20. For example, during the Company's August 1, 2019 earnings call, Defendants told investors that First Solar had "***met [its] first half commitment on the [Series 6 cost per watt] reduction***."

21. At the same time, Defendants made glowing statements concerning the Series 6 watts per module and its progress toward the target of 460 watts per module, which they described as "steady." For example, on August 1, 2019, Defendants called First Solar's Series 6 watts per module improvement "significant," stating that "[t]he average watt per module has increased 3 watts."

22. When asked by analysts about whether the Series 6 had failed to meet the Company's contractual obligations to its customers with respect to the watts per module, Defendants affirmatively denied there were any problems.

23. Unbeknownst to the market, however, the Series 6 modules were riddled with significant problems, including manufacturing and performance defects, which were negatively impacting both the cost per watt and watts per module figures for the Series 6. As detailed by numerous FEs herein, the problems with the Series 6 included: (i) electrical problems that were causing fires in installed modules; (ii) watts per module outputs that

were both inconsistent and variable; and (iii) problems with the packaging and shipping of the Series 6 that resulted in numerous broken modules.

24. Indeed, certain of the problems with the Series 6 modules were so severe during the Class Period that the Company's highest-ranking executives discussed them internally at Company Town Hall meetings. Moreover, as described herein, FEs of the Company stated that the Series 6 problems were well-documented internally in communications and reports that the Individual Defendants received or had access to during the Class Period.

25. Importantly, while Defendants were well-aware of the problems with the Series 6, they were motivated to conceal these issues from investors. Indeed, as discussed below and unbeknownst to the market, First Solar's pipeline for its Project Development business had dwindled significantly. Moreover, Defendants not only contemplated a sale of this business, but the Company had already begun dismantling this division.

26. While they were misrepresenting and omitting critical facts about the Modules Segment, Defendants also misrepresented and concealed material information from the market regarding First Solar's Systems Segment, specifically, the unit's Project Development business.

27. Just before the start of the Class Period, Defendant Mark Widmar, First Solar's CEO, emphasized that the Company's "potential systems opportunities remain strong at 1.8-gigawatt," explaining that "[t]hese potential systems bookings are comprised of projects in the U.S. and over 300 megawatts in Japan." Then, during the Class Period, Defendants told investors that the Company was presently meeting or exceeding its pipeline target of one gigawatt per year in new Systems projects that Defendants shared with investors at the end of 2017.

28. For example, First Solar touted the strength of the Company's pipeline on August 1, 2019, stating that First Solar's "mid- to late-stage pipeline include[d] 1.9 gigawatts of systems opportunities across U.S. and Japan." During the Company's earnings call on October 24, 2019, Defendants similarly stated with respect to the

Company's Systems pipeline: "our mid- to late-stage pipeline includes approximately 2 gigawatts of systems opportunities across the United States and Japan."

29. Defendants' representations about its Project Development pipeline were materially false or misleading. In truth, the pipeline for the Project Development business had all but dried up before and during the Class Period, as later confirmed by an in-depth analysis published by Barclays on January 15, 2020. This comprehensive report revealed that, unbeknownst to the market, First Solar's Systems Segment had lost 80% of its market share—while First Solar once "captured 20% of the market," it reflected only "4% of the pipeline" as of January 2020. Similarly, focusing its analysis on the Company's Project Development pipeline, Barclays discovered that for 2018, First Solar's pipeline projects represented just .6 GW of the 32.0 GW in total U.S. projects, and for 2019, the number was even smaller, at just .4 GW of the 32.5 GW in total U.S. projects. According to Barclays, the steep decline in First Solar's market share of the project development space began as early as 2017, with the Company's share of new U.S. development projects decreasing markedly from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019.

30. Making matters worse, Defendants also repeatedly gave investors the false impression that the Company had long-term plans for its all-important Project Development division. To this end, Defendants stated just prior to the start of the Class Period that First Solar was making what it referred to as a "big investment" in the Project Development business in order to secure future projects, and further explained that the Company would be "investing somewhere, call it, $300 million to $400 million to secure, call it, 5 gigawatts of opportunities between now and 2023."

31. Later, in response to investor concerns flowing from the Company's decision to outsource its EPC business, Defendants reassured the market that the Project Development business was not headed for a similar fate, stating that the Company would continue "executing on [its] project development pipeline with the same level of service that [its] customers have come to expect."

32. In reality, however, accounts from First Solar former employees confirm that while they were issuing positive statements about the Systems Segment and the Project Development division, Defendants had begun quietly dismantling the Project Development unit and exploring options to divest the business in the first half of 2019, without telling the market.

33. Investors belatedly learned the truth regarding the Modules Segment and the Project Development business beginning on October 24, 2019, and continuing through February 20, 2020. Initially, on October 24, 2019, Defendants revealed to the market for the first time that notwithstanding their prior representations that the Company hit the milestones necessary to meet its targeted cost per watt reduction, First Solar would not achieve the promised 40% reduction by year-end 2019.

34. On this news, the price of First Solar's common stock declined by nearly 6%, dropping over $3 per share, from a close of $55.89 on October 24, 2019, to $52.66 on October 25, 2019.

35. Then, in the wake of a January 15, 2020 report published by Barclays that revealed that the pipeline for the Project Development business had all but dried up before and during the Class Period, the price of the Company's common stock fell another 7%, or more than $4 per share.

36. Finally, on February 20, 2020, investors learned the full truth about the Series 6 modules. On that day, Defendants stunned investors when they admitted for the first time that the Company ***would not*** achieve its 2019 target of a 40% reduction in cost per watt for the Series 6 by the end of 2020.

37. In addition, Defendants revealed, again for the first time, that their touted improvements in watts per module had stalled and the Company remained well short of its midterm target for this metric. Defendants also disclosed to investors that the Company's failure to hit the 2019 cost per watt target was due to "challenges with regard to certain aspects of the overall cost per watt." Incredibly, the bad news did not stop there. Defendants piled on the Barclays report by revealing that First Solar was actively seeking

to divest its Project Development unit, effectively admitting that the problems with this division were severe and stood in stark contrast to their representations during the Class Period.

38. First Solar's common stock further plummeted ***another*** nearly ***15%***, falling an additional $8.73 per share on this previously undisclosed news. Class members were damaged and now bring this action.

## II. JURISDICTION AND VENUE

39. The claims asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

40. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.

41. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), because Defendant First Solar conducts business in this District and also maintains its administrative headquarters in this District.

42. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

## III. PARTIES

### A. Lead Plaintiffs

43. Lead Plaintiff Palm Harbor Special Fire Control & Rescue District Firefighters' Pension Plan ("Palm Harbor Firefighters") provides pension benefits for former vested employees (i.e., retirees) of the Palm Harbor Special Fire Control & Rescue District in Palm Harbor, Florida, and had approximately $42 million in assets under management as of October 1, 2021. As set forth in the certification attached hereto as Exhibit A, Palm Harbor Firefighters purchased or otherwise acquired First Solar common

stock at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein.

44. Lead Plaintiff Greater Pennsylvania Carpenters' Pension Fund ("Pennsylvania Carpenters'") provides pension benefits for thousands of beneficiaries across Pennsylvania and has approximately $1 billion in assets under management. As set forth in the certification attached hereto as Exhibit B, Pennsylvania Carpenters' purchased or otherwise acquired First Solar common stock at artificially inflated prices during the Class Period and was damaged as a result of the conduct alleged herein.

**B. Defendants**

**1. First Solar**

45. Defendant First Solar, a Delaware corporation headquartered in Tempe, Arizona, bills itself as a "leading global provider of comprehensive [photovoltaic] solar energy solutions." First Solar's common stock trades on Nasdaq under the ticker symbol "FSLR." As of February 14, 2020, First Solar had over 105 million shares of common stock outstanding.

**2. The Individual Defendants**

46. Defendant Mark Widmar ("Widmar") has served as First Solar's Chief Executive Officer ("CEO") since July 2016. Widmar has also served as a member of First Solar's Board of Directors ("Board") since 2016. Widmar previously served as the Company's Chief Financial Officer ("CFO") from April 2011 to June 2016. As alleged herein, Widmar made materially false or misleading statements and omissions during First Solar's earnings conference calls on February 21, 2019, May 2, 2019, August 1, 2019, and October 24, 2019, and in a Company press release issued on September 19, 2019.

47. Defendant Alexander R. Bradley ("Bradley") has served as First Solar's CFO since October 2016. From May 2008 until his appointment as CFO, Bradley served as "Vice President of both Treasury and Project Finance." As alleged herein, Bradley made materially false or misleading statements and omissions during First Solar's earnings conference call on October 24, 2019.

48. Defendant Georges Antoun ("Antoun") has served as First Solar's Chief Commercial Officer ("CCO") since July 2016.

49. Defendants Widmar, Bradley, and Antoun are collectively referred to herein as the "Individual Defendants."

**C. Certain Relevant Non-Parties**

**1. First Solar Executives**

50. Raffi Garabedian ("Garabedian") served as First Solar's Chief Technology Officer from May 2012 through the end of the Class Period.

51. Philip Tymen deJong ("deJong") served as the Company's Chief Operating Officer from July 2015 through the end of the Class Period.

**2. Former Employees**[1]

52. FE 1 was a First Solar engineer from at least 2016 through the end of the Class Period. FE 1 worked out of First Solar's headquarters in Tempe, Arizona throughout his tenure.

53. FE 2 was a regional manager who worked for First Solar from at least 2016 to 2020 and was responsible for overseeing EPC construction quality for First Solar in many countries across the world. In this role, FE 2 would receive notifications of problems with the Series 6 that he should assess in the form of emails or reports.

54. FE 3 was a First Solar quality assurance specialist and electrical lead from mid-summer 2018 to late summer 2019. In this role, FE 3 inspected Series 6 modules at the Willow Springs project.

55. FE 4 was a power plant manager in First Solar's O&M division. FE 4 worked at approximately 10 sites in multiple states between 2019 and 2020. Several of these sites utilized the Series 6.

[1] Former Employees ("FEs") will be identified herein by number (FE 1, FE 2, etc.). Regardless of gender, all FEs will be described in the masculine to protect their identities.

56. FE 5 was a Lead in First Solar's Quality Assurance group from at least 2016 to 2020. In this role, he worked to ensure quality systems installation, including for sites using the Series 6.

57. FE 6 was a project manager in O&M throughout the Class Period. In this role, he worked to integrate O&M sites, including sites that used the Series 6, into First Solar systems.

58. FE 7 was a logistics coordinator with First Solar from at least 2016 to late 2019. In this role, FE 7 worked on numerous development projects for First Solar, including installations of the Series 6.

59. FE 8 was a First Solar employee from at least 2016 to summer 2019 who worked as a supply chain manager in First Solar's EPC segment. In this role, FE 8 worked directly on projects that installed the Series 6.

60. FE 9 worked in various roles at First Solar, including in Finance. FE 9 reported to the Vice President FP&A. FE 9 was assigned various tasks to handle and worked with First Solar CEO Mark Widmar, who was a mentor to him.

## IV. FACTUAL ALLEGATIONS

### A. First Solar's Class Period Business Model

61. As discussed above, during the Class Period, First Solar operated two main segments—the Modules Segment and the Systems Segment, also referred to as "Systems." The Company explained the management and financial contributions of these Segments in its 2018 Form 10-K, filed with the SEC on February 22, 2019 ("2018 Form 10-K"):

> Our segments are managed by our Chief Executive Officer, who is also considered our chief operating decision maker ("CODM"). Our CODM views sales of solar modules or systems as the primary drivers of our resource allocation, profitability, and cash flows. Our modules segment contributes to our operating results by providing the fundamental technologies and solar modules that drive our business and sales opportunities, and our systems segment contributes to our operating results by using such modules as part of a range of comprehensive PV solar energy solutions, depending on the customer and market opportunity.

**1. The Modules Segment**

62. First Solar was the world's largest manufacturer of thin-film solar PV modules during the Class Period. Unlike many traditional solar panels, First Solar's modules utilize a thin layer or film of semiconductor material. The Company claims that this thin-film technology increases the energy production capabilities of the modules, in addition to providing other advantages compared to traditional panels. Once assembled and installed outside in the sunlight, energy from the sun is absorbed by the PV cells in the panels and converted into electricity. Solar modules can be used individually, or several modules can be connected to form an array. One or more arrays are then connected to an electrical grid to form a PV system.

63. During the Class Period, First Solar's panels were manufactured by its Modules Segment. The primary customers for First Solar's modules were integrators and operators of PV solar power systems, including Cypress Creek Renewables (an integrated solar and storage company that develops and owns solar and storage projects), Longroad Energy (a renewable energy developer focused on the development, ownership, and operation/asset management of wind and solar energy projects), and NextEra Energy (a utility company that generates wind and solar power and bills itself as the world's largest utility company).

64. Prior to 2019, First Solar primarily manufactured and sold its Series 4 solar module. The Series 4 module measured approximately two feet by four feet, with a peak electrical power output rating of 125 watts.

65. At end of 2016, First Solar announced it would be phasing out the Series 4 module and transitioning to its new module, the Series 6. The Series 6 was intended to be larger (measuring approximately four feet by six feet) and more powerful (with a peak electrical power rating of over 400 watts) than the Series 4.[2] The shift from the Series 4 to

---

[2] Power output for solar panels is often discussed in terms of the "bin" or "bin class" for the module, which is based on 5-watt increments, e.g., 400 watts, 405 watts, 410 watts. A module's bin class is determined by the range within which the module's wattage falls,

the Series 6 required a significant capital investment from First Solar. Indeed, retooling just one of the Company's manufacturing facilities, in Perrysburg, Ohio, to produce the Series 6 modules cost approximately $177 million and took almost a year to complete.

66. Against this backdrop, Defendants were eager to ramp up production of the new Series 6 panels. As Defendant Widmar explained in a November 16, 2016 press release, "[t]he acceleration of the Series 6 roadmap is an important development for First Solar" and "we expect the transition to Series 6 will enable us to maximize the intrinsic cost advantage of [First Solar's] thin-film technology" when compared to more traditional solar panel technology.

67. The Company's key executives (Widmar, Bradley, deJong, and Garabedian) "unveiled the first functional Series 6 . . . off the company's Perrysburg, Ohio new production line" on December 5, 2017. During First Solar's Analyst Day conference call that same day ("Analyst Day Call") the Company's executives touted the Series 6 as the cheapest, most reliable, and most bankable solar module yet. As Defendant Widmar told investors, the "Series 6 is going to give us a differentiated product and a position of strength, which we now can evaluate, how we want to engage the market, and how we think about capacity expansion."

68. Key to the executives' pitch to the market regarding First Solar's new module was the increased footprint and output of the Series 6, compared to the Series 4. For instance, Garabedian presented the below slide, titled "Watts Per Module Roadmap," which indicated that the Series 6 modules would produce an average output of 460 watts after ramp-up, far surpassing the 125 watt capabilities of the Series 4.

---

rounded down. For example, a module with a 404 watt output is classified as a 400-watt module and a module with a 406 watt output is classified as a 405-watt module.




69. As Garabedian explained: "Now here, you see the transition to Series 6. So Series 6 will launch with a 430, roughly, watt nameplate. That's after the initial ramp and stabilization of the production line. And then, in the midterm, we intend to get Series 6 up to around 460 watts."

70. Notably, Garabedian told investors that the Company would begin to report watts per module for the Series 6, rather than the percent power conversion metric that First Solar had used in the past. In explaining this transition, Garabedian stated:

> Now as we convert to Series 6, we're taking the opportunity to actually switch to the more conventional metric of watts per module. Why are we doing this? It's because that's what our customers are thinking, that's how our competitors sell, and so we're going to do that as well.

71. Another key theme of the executives' Series 6 presentation was that the new module would reduce costs, specifically the cost per watt, rendering it a more profitable and competitive product when compared to the Series 4. For example, in discussing the costs of the Series 6, Garabedian presented a slide highlighting the "LOW MODULE CPW [cost per watt]" with the Series 6 and represented that the Series 6 would have a "40% reduction vs. Series 4."

72. Garabedian also addressed the Company's careful attention to the Series 6 design, stating:

> The design of the Series 6 module, not only its size but also the design of the frame and other elements of the module, affect about 20% of this pie, right? These are things like the electrical balance of system, the wiring, the DC wiring, the structure, the labor installation velocity of getting the modules up onto that structure and wired and connected. So these are all factors that we've taken a very, very careful look at, we've studied deeply, and we've optimized the Series 6 design to go and deliver the lowest cost -- possible costs in all of these areas, which ultimately delivers greater value, not only to our own EPC and project development activities, but also to our third-party customers.

73. In addressing the mounting of the Series 6, Garabedian stated: "We have an innovative dual junction box, dual [cord plate] on this module."[3]

74. Defendant Widmar echoed Garabedian's remarks touting the Series 6, calling the new module "a differentiated technology" and explaining that "as we move to Series 6, I've [sic] even created a more disruptive position from a cost standpoint."

75. The market understood the importance of the Series 6 to First Solar's future. For example, on October 27, 2017, Morningstar Equity Research published an analyst report explaining that "[t]he Series 6 rollout and subsequent module bookings are critical to the company's long-term value." The report went on to state that First Solar's "quest now is to keep panel efficiencies ahead of the competition." Finally, the report stated that "First Solar's long-term health will depend on its transition to selling Series 6 modules while limiting the overhang of Series 4 inventory."

76. As Cowen similarly explained in a February 21, 2019 analyst report:

> If . . . cost targets are reached, the exciting Series 6 (S6) transition should lead to First Solar having a permanent cost advantage in both module and system cost versus Asian based peers. Notably, Series 6 is anticipated to have a 40% cost reduction versus Series 4, which should drive costs

---

[3] A "cord plate," also referred to as a "junction box," is a device that is affixed to the back of a solar module. The cord plate connects the solar panel and the wiring to enable power generation. The cord plate is typically designed with waterproof and fireproof sealing, among other protective technologies, to ensure the components are protected from the elements.

approaching $0.18/w over time versus Asian peers in the low to mid-$0.20/w range.

77. As detailed in Section IV.B below, First Solar continued to hail the increased output and cost reduction capabilities of the Series 6 during the Class Period, despite the fact that the Company experienced significant issues with the module, including manufacturing and performance defects and low and inconsistent output, as confirmed by multiple former First Solar employees.

**2. The Systems Segment**

78. During the Class Period, First Solar's Systems Segment "provide[d] complete turn-key PV solar power systems, or solar solutions, that draw upon [its] capabilities, which include (i) project development, (ii) EPC [i.e., engineering, procurement, and construction] services, and (iii) O&M [i.e., operations and maintenance] services."

79. Importantly, the Systems Segment created solar power plants where First Solar could install its solar modules. As the Company explained in its 2018 Form 10-K, "our systems segment contributes to our operating results by using such [First Solar] modules as part of a range of comprehensive PV solar energy solutions, depending on the customer and market opportunity." According to its 2019 Form 10-K, filed with the SEC on February 21, 2020 ("2019 Form 10-K"), the primary customers of First Solar's Systems Segment during the Class Period included "utilities, independent power producers, commercial and industrial companies, and other system owners."

80. As part of the Systems Segment, the Company's Project Development business worked to, among other things, select, secure, and maintain a site for the potential construction of a solar power system or plant; obtain any necessary studies and permits for the site; and enter into a power purchase agreement ("PPA"), with a third party or "off-taker," with respect to the solar power to be generated by the project.[4] First Solar explained

---

[4] A PPA is a contract used in the solar industry in which a developer arranges for the

in its 2018 Form 10-K that Project Development's "activities culminate in receiving the right to construct and operate a PV solar power system."

81. During the Class Period, the Project Development business generated a significant percentage of the Company's revenues from contracts with customers. According to First Solar's 2019 Form 10-K, the Project Development business, reflected in the line items for "Solar power systems" in First Solar's Form 10-K, generated approximately $1.15 billion of the total $3.06 billion in revenue from these customer contracts. For the year ended December 31, 2018, the figure was even higher, with "Solar power systems" generating approximately $1.2 billion of the Company's total $2.2 billion in revenue from contracts with customers.

82. Prior to the start of the Class Period, Defendants established a one-gigawatt per year target for new projects within the Project Development business. In discussing the Company's annual new business target for Project Development, Defendant Bradley stated during the December 5, 2017 Analyst Day Call: "From a business mix perspective, we look to have about 1 gigawatt a year of development business, some incremental EPC business, O&M business and then a significant expansion of module sales as we grow capacity." Defendant Widmar similarly explained, with respect to this target, that "it will be around 1-gigawatt or so, as we look at [it] over the next few years."

83. Later during the Analyst Day Call, Defendant Antoun echoed Defendant Bradley's and Defendant Widmar's statements, explaining "we believe [what] we'll do is a 1 gigawatt per year of our own development." Antoun explained that one gigawatt provided a good balance because it gave First Solar "the technical differentiation, the commercial know-how" and "at the same time," allowed the Company to "maintain the relationship and the balance with our customers, our partners that are developers

design, permitting, financing, and installation of a solar energy system for a customer with little upfront costs for the customer and then sells the power generated at the solar energy system to the customer at a quantity, rate, and term of years as specified in the PPA.

themselves and mak[e] sure that we turn that capacity to help them also go out there and win."

84. During the Analyst Day Call, Defendant Bradley further stated with respect to the Project Development business: "[H]istorically, we have spent significant money on development assets individually and development pipelines, and that's an area where we're still very comfortable deploying capital. We're still very active in that market, and we'd look to deploy more capital there if we can find the right assets and returns."

**3. First Solar's Vertically Integrated Business Model**

85. Due to its interrelated Modules and Systems Segments discussed above, First Solar stood to generate income not only through the manufacture and sale of solar panels and the creation of Project Development sites, but also through the EPC and O&M businesses that continued to earn money for First Solar after a project was developed and then sold.

86. Specifically, during construction and after a site was sold, the Company's EPC business provided engineering design and related services, such as construction contracting, while the Company's O&M business provided support to the sites, including activities associated with operating and maintaining a solar power system.

87. Significantly, the solar power systems or plants developed by the Project Development business primarily utilized the Company's solar modules, including the Series 6. As Defendant Widmar explained during the 2017 Analyst Day Call: "[A]ll the development assets for next year, at least project assets, are going to be constructed with Series 6" consistent with the Company's strategy "to accrete value through our own development pipeline by using Series 6." Thus, according to industry analysts, First Solar's value proposition was premised on its "through-cycle support from project development," which is where "most of the multi-year gross profit emanates, irrespective of manufacturing's booms and (and mostly) busts."

88. First Solar's 2018 Form 10-K provided the following description of the Company's business model, emphasizing the purported benefits of its vertically integrated structure:

> ***Vertical Integration***
>
> We are vertically integrated across substantially the entire solar value chain. Many of the efficiencies, cost reductions, and capabilities that we deliver to our customers are not easily replicable for other industry participants that are not vertically integrated in a similar manner. Accordingly, our operational model offers PV solar energy solutions that benefit from our wide range of capabilities, including advanced PV solar module manufacturing, project development, engineering and plant optimization, grid integration and plant control systems, procurement and construction services, and O&M services.

89. First Solar's annual proxy statement on Form DEF 14A, filed with the SEC on April 3, 2019, similarly stated:

> We believe that our strategies and points of differentiation, which include our advanced module and system technologies, our manufacturing process, our vertically-integrated business model, our financial viability, and the sustainability of our modules and systems, provide the foundation for our leading industry position and enable us to remain one of the preferred providers of PV solar energy solutions.

90. In the months leading up to the Class Period, Defendants repeatedly boasted about the advantages of the Company's vertically-integrated business structure—confirming the importance of the Project Development business to First Solar's strategy and profitability. For example, during the 2017 Analyst Day Call, Defendant Widmar explained that "the reason we wanted to be in development as well as within EPC is it allows us to optimize the value chain, it allows us to be an influencer, it allows us to drive cost out." Defendant Bradley similarly emphasized the Company's commitment to its vertically integrated structure and the Project Development business during the Analyst Day Call, stating: "I want to be very clear . . . We are in no way exiting the development or EPC businesses[;] . . . we are very much in the development game." Bradley further explained that Project Development "is core to our strategy . . . in the U.S."

**4. Relevant First Solar Projects**

91. Prior to and during the Class Period, First Solar had several important, active projects where its new Series 6 modules were being installed. These projects included, among others: California Flats, Willow Springs, Seabrook, Mount Signal II, Cove Mountain, Sun Streams, and Sunshine Valley.

92. California Flats is a 280-megawatt PV solar power station located near the borders of San Luis Obispo County and Monterey County in California. First Solar acquired the project in 2015 and began full construction on the site in 2016. In 2017, First Solar sold the project to Capital Dynamics, a private asset management firm, and partnered with Capital Dynamics until the project's completion, which was announced on May 28, 2019. FE 1 reported that California Flats was First Solar's first commercial project to receive Series 6 modules.

93. Willow Springs is a 110-megawatt PV solar power station located in Kern County, California, which was originally developed by First Solar. In October 2018, while the project was still under construction, First Solar sold the project to D.E. Shaw Renewable Investments ("D.E. Shaw"). Willow Springs is powered, in part, by Series 6 modules.

94. Seabrook is a 72-megawatt PV solar power station located in Beaufort County, South Carolina. First Solar developed the Seabrook project using Series 6 modules before selling it to Dominion Energy in October 2019.

95. Mount Signal II is a 200-megawatt PV solar power station in Imperial County, California. Swinerton Renewable Energy built Mount Signal II using Series 6 modules.

96. Cove Mountain is a 180-megawatt PV solar power station in Iron County, Utah. First Solar developed the project before selling it to D.E. Shaw in October 2019. The project is powered by Series 6 modules.

97. Sun Streams is a 154-megawatt PV solar power station in Maricopa County, Arizona. First Solar installed Series 6 modules at Sun Streams before selling the project to ConnectGen LLC ("ConnectGen") in 2019.

98. Sunshine Valley is a 104-megawatt PV solar power station in Nye County, Nevada. First Solar installed Series 6 modules at Sunshine Valley before selling the project to ConnectGen in 2019.

### B. Defendants Fraudulently Conceal Issues With the Series 6

99. Throughout the Class Period, Defendants made materially false or misleading misstatements and omissions concerning the Series 6. Specifically, Defendants boasted about the purported consistent improvement of the watts per module metric for the Series 6 and further represented that the Company was hitting the milestones necessary to meet its stated Series 6 cost per watt reduction target. Thus, according to Defendants, the Series 6 was outperforming and would continue to outperform the Series 4 with respect to both cost efficiency and wattage output.

100. Importantly, Defendants knew that investors were keenly focused on the cost per watt figure for the Series 6. Indeed, the Company represented in its 2018 Form 10-K that the Series 6 was "among the lowest cost module manufacturers in the solar industry on a module cost per watt basis" and further stated that "[t]his cost competitiveness allows us to compete favorably in markets where pricing for modules and fully integrated PV solar power systems is highly competitive."

101. Unbeknownst to investors, however, the Series 6 had a component that was failing in the field and causing fires, among other defects, and fell short of its cost per watt and watts per module targets.

#### 1. The Series 6 Suffers from Significant, Undisclosed Manufacturing and Reliability Problems

102. Multiple FEs have confirmed that while Defendants were touting the Series 6's progress and ability to meet the stated cost per watt and watts per module objectives, First Solar was experiencing significant undisclosed issues with the module.

According to the FEs, the undisclosed problems plaguing the Series 6 prior to and during the Class Period included: (i) the Series 6 had failures with respect to its wiring system, including incidents that caused fires in the field; (ii) the Series 6 failed to meet wattage output targets by sizable margins and demonstrated inconsistent, variable wattage; and (iii) the Series 6 was negatively impacted by significant issues with packaging and transportation that resulted in large numbers of damaged modules.

103. The issues with the Series 6, which in many instances required First Solar to repair or replace the defective modules, as confirmed by the FEs, increased the costs associated with producing each watt of power, and thus had a detrimental impact on the Company's all-important cost per watt metric. Several of the issues also impacted the Company's watts per module figure for the Series 6.

**a. Output Problems**

104. A number of FEs confirmed that the output for the Series 6 modules was not only inconsistent, but that the modules were unable to reach the target output once installed. Indeed, these FEs confirmed that the output for the Series 6 was significantly below First Solar's 460 watts per module midterm target. The output inconsistencies and shortfalls negatively impacted First Solar in several ways, including forcing the Company to pay liquidated damages to customers, cancel module deliveries and installations, or to install additional panels in order to deliver the wattage required by its contracts.

105. FE 1, an engineer, recalled that the Series 6 rollout was "met with challenges," and that First Solar had "not realized" its intended "panel capacity" for that module at any point during his tenure, which ended in 2021. FE 1 reported that when the Series 6 was first released in late 2018, the panels were providing somewhere between 400 and 420 watts and were installed at the California Flats project in California. FE 1 explained that 440 watts was the internal "benchmark" wattage for 2019, but confirmed that the Series 6 had never reached this benchmark by the time he left First Solar in 2021. According to FE 1, the output for each module was indicated on the panel. FE 1 recalled that the numbers on the modules never indicated "440" before he left the Company in 2021.

106. With respect to the California Flats project specifically, FE 1 advised that First Solar had been experiencing variabilities in wattage at this site and stated that he worked on mapping the placement of the Series 6 modules based on output for the California Flats – South area of the project. According to FE 1, when the project was completed as originally designed, California Flats – South was short on "DC Capacity," so First Solar had to install additional modules and arrays.

107. FE 2 also reported that the Company was forced to add additional modules to several construction sites in 2019 because the Series 6 was not generating the necessary wattage to meet the requirements set forth in the PPAs. FE 2 indicated that First Solar could not produce consistent wattage for the Series 6 modules off the production line. FE 2 believed output issues occurred at California Flats and possibly Willow Springs. FE 2 learned of these issues from his field inspector who would have to revise his inspection reports to reflect the added rows of modules.

108. FE 4 reported that it was not uncommon for Series 6 sites to be divided up into areas where, for example, one area of the field had an output of 380 watts per module, another had 400, and another had 360 because the panels in those areas came off the production line at different times and differed in their wattage capabilities. FE 4 further described Series 6 customer contract issues, including with D.E. Shaw, due to under-production in terms of wattage. FE 4 recalled that several plants with Series 6 modules were not meeting the wattage required under First Solar's contracts or PPAs, causing the Company to pay liquidated damages.

109. FE 6 reported that the Series 6 failed to produce the expected output, and stated that, because certain modules fell well below wattage output targets, the Company could not deliver those modules to customers.

**b. Electrical Problems**

110. Multiple FEs also confirmed that First Solar was experiencing significant electrical problems with the Series 6 modules, including issues that were causing fires after the modules had been installed in the field.

111. In his role within the Company's Quality group, FE 2, received reports of issues with the Series 6, including issues causing fires in the field. As, FE 2 explained, First Solar's manufacturing team located in Perrysburg, Ohio would email reports to his Quality group describing the problems and asking the Quality personnel to inspect the modules and identify defective units. According to FE 2, in late 2018 and early 2019, these Series 6 issues included problems with the cord plate and the "potting,"[5] which was causing the cord plate to come loose, and in some instances, catch fire. FE 2 explained that the reports from the manufacturing team asked the Quality personnel on his team to inspect the cord plates and potting in the field, including at the California Flats project, to try and identify modules affected by this defect. FE 2 confirmed that the potting problems were unique to the Series 6 and were not experienced with First Solar's Series 4 modules.

112. FE 1 also recalled hearing reports of fires at the California Flats project around early 2019.

113. FE 3 reported that there were quite a number of fires in the Series 6 junction boxes at Willow Springs, which he described as a "major problem." FE 3 explained that the junction boxes would be blown out and short circuited. FE 3 reported that the junction box issues began in 2018 and persisted throughout 2019. FE 3 further stated that when the junction boxes blew out, it would take down the entire electrical circuit at the project. FE 3 indicted that with respect to the junction box fires, First Solar only cared about getting the modules replaced.

114. FE 4 similarly reported that the Series 6 experienced fires in the back of the panel junction box, which would melt and disable the module. FE 4 indicated that, as a result of this malfunction, the Series 6 modules were disabled at certain First Solar projects, including Mount Signal II, Cove Mountain, and Sun Streams.

---

[5] "Potting" refers to a process through which a potting gel is used to adhere the cord plate or junction box to the back of a solar panel. The potting process seals the cord plate to provide protection from the elements.

115. FE 5 also stated that there were issues with the wiring for the Series 6 that were causing the fires in the junction boxes. Specifically, FE 5 reported that he worked at the same First Solar facility in Mesa, Arizona that housed the Company's Arizona Test Site. According to FE 5, the lab at the Arizona Test Site was working on developing a fix for the defective Series 6 junction boxes. Based on his conversations with his colleagues working in this lab, FE 5 understood that there was a wiring connection in the junction box for the Series 6 modules that was not a complete connection. As FE 5 explained, this open connection caused overheating that melted the junction box and resulted in fires. FE 5 stated that the First Solar employees at the Arizona Test Site spent more than a year trying to come up with a solution for the defective wiring and melting junction boxes. FE 5 reported that one of the potential fixes tested by the lab personnel was the installation of a metal box over the junction box. However, the metal box got so hot that it started more fires. FE 5 stated that he saw melted junction boxes on the Series 6 modules that resulted from the arcing.

116. FE 5 reported his understanding that the issues with the faulty wiring impacted at least the first 200,000 Series 6 modules to come off the production line and that First Solar had decided not to assign an inspector to the production line for these initial Series 6 modules, so the Company did not have anyone checking the junction boxes. FE 5 understood that these modules were sent to the California Flats and Willow Springs projects, in addition to another First Solar project located in the same area. According to FE 5, all three of these projects experienced problems with melting Series 6 junction boxes and resulting fires. FE 5 further reported that rather than recall failing modules, which the Company feared would signal issues with the Series 6, the Company dispatched a number of manufacturing engineers to the field to attempt to address burning wires.

117. According to FE 5, First Solar rushed the Series 6 modules, into production, which resulted in a number of quality issues, including the fires.

118. FE 9 also said that the Series 6 modules caught fire.

**c. Broken Modules**

119. FE 7, a site logistics coordinator, reported that the Series 6 modules were a logistical nightmare. FE 7 stated that the modules were very large and fragile and indicated that there were numerous packaging failures. According to FE 7, the Series 6 modules were packaged in a wood frame and weighed approximately 1,600 to 1,700 pounds. The packaged modules were so large that the only way to lift them off the truck was to use an extendable boom. FE 7 stated that because most job sites did not have a suitable flat area for unloading, modules were broken while they were unloaded. FE 7 reported that during the second phase of the California Flats project, about half of the Series 6 panels were broken prior to installation. FE 7 further stated that he was constantly shipping Series 6 modules back to Ohio for repair. FE 7 indicated that the combination of replacing damaged modules being delivered to the site as well as replacing defective modules identified during installation increased the cost of each project. FE 7 confirmed that all of these costs would be reflected in the cost per watt for the modules.

120. FE 8 also reported issues with Series 6 modules being broken prior to installation, and recalled that the modules were being damaged in transit. According to FE 8, the Series 6 modules were used in the last phase of the California Flats project. FE 8 explained that if modules were arriving broken, then the cost per watt would increase because First Solar would need to ship additional modules.

**2. Defendants Knew of or Recklessly Disregarded the Undisclosed Problems Related to the Series 6 During the Class Period**

121. In addition to detailing the myriad issues plaguing the Series 6 modules, the FE accounts confirm that Defendants, the senior-most officers and executives of the Company, were aware of and/or had access to information regarding these problems during the Class Period.

122. For example, FE 9—who worked with Defendant Widmar, who was a mentor to him—said that Defendant Widmar knew about the issues with the Series 6 modules.

123. These allegations are corroborated by the other FE allegations demonstrating: (i) Defendants attended and participated in Town Hall meetings where the Series 6 problems were discussed; and (ii) Defendants were provided information or had access to information specific to the Series 6 problems.

**a. Attendance at and Participation in Town Hall Meetings**

124. Multiple FEs indicated that issues with the Series 6 were discussed at the Company's "Town Hall" meetings, with Defendants in attendance personally.

125. In describing these meetings, FE 4 stated that almost every quarter during the period from at least 2018 through 2020, Defendant Widmar held "all hands town hall" meetings at the Company's Tempe office, typically on or around the day of First Solar's earnings call. FE 4 confirmed that he attended each such Town Hall meeting, either in person or via WebEx. FE 4 reported that Defendant Widmar typically led these meetings, but that Defendants Bradley and Antoun also spoke at the Town Halls.

126. FE 1 reported that up to the end of his tenure in 2021, he attended quarterly "all-hands" meetings that were led and attended by Defendants Widmar and Antoun. FE 1 further recalled that Widmar and other senior executives admitted at these meetings that the Company had not yet reached the "baseline" output of 440 watts for the Series 6 panels.

**b. Reporting on Series 6 Issues**

127. The FEs also confirmed that, in addition to the Town Hall meetings, the Individual Defendants were provided information or had access to information specific to the Series 6 problems discussed above.

128. FE 2 explained that, in terms of the problems with the modules, the Perrysburg manufacturing team would inspect and diagnose the issues and then notify the Company's C-Suite of any necessary training or meetings to address the problems. FE 2 also reported that he received PowerPoint slides discussing the problems with the modules in the field and indicated that these slides would have been reviewed and approved by First Solar's C-Suite before he received them.

129. FE 2 further reported that when an issue became too unmanageable in the field, the Company would send manufacturing personnel to look into the issue. FE 2 stated that Willow Springs and California Flats were two First Solar projects where the manufacturing division had to send their own personnel to address issues with the Series 6 modules.

130. Additionally, as FE 6 reported, the difference between the actual output of certain Series 6 modules and the expected output was large enough that the Company could not ship the modules to customers. FE 6 confirmed that the Company withheld such shipments on multi-million dollar contracts. According to FE 6, there was no way that First Solar's upper management could not have known of decisions to withhold shipment on modules for multi-million dollar contracts.

131. FE 7 also stated that from approximately July through September 2019, there were major problems at First Solar's Seabrook project. FE 7 reported that among the issues at the Seabrook site were problems with the Series 6 modules. FE 7 said that First Solar's Vice President of Construction and two "Directors" visited the Seabrook site to address the problems.

132. Importantly, while Defendants were well-aware of the problems with the Series 6, they also knew that investors' focus on the module and its performance would be heightened significantly once the market learned that the pipeline for First Solar's Project Development division, a key component of the Company's often-lauded "vertically integrated structure" had dried up and Defendants had not only begun dismantling the division, but were also looking to offload the entire business. Thus, Defendants were motivated to conceal from investors the problems impacting the Series 6 and the module's all-important cost per watt and watts per module metrics.

### 3. Defendants Misleadingly Affirm That the Series 6 Was Meeting Its Wattage and Cost Reduction Targets

133. Despite knowing that the Series 6 suffered from significant problems that negatively impacted its cost per watt and output metrics, throughout the Class Period,

Defendants misled investors about the Series 6 by representing that the Company was achieving the milestones necessary to meet the cost per watt reduction target for the Series 6 in 2019.

134. On February 21, 2019, after the market closed, First Solar hosted its 2018 fourth quarter and full year earnings call. During this call, Defendants discussed First Solar's plan to reduce the cost per watt for the Series 6 in 2019. As Defendant Bradley explained: "Module cost per watt is expected to improve in the second quarter but will still be 5% higher than the average. The greatest benefit of our improved ramp and efficiency is anticipated to be in the second half of the year. In the third quarter, the cost per watt is expected to be 5% below and the fourth quarter 10% below the 2019 full year average."

135. Defendants likewise assured investors that First Solar was seeing steady improvement in the output, or watts per module, for the Series 6. The output metric was particularly important because, as discussed by several FEs (*see supra* Section IV.B.1.a), First Solar's customer contracts had provisions that required a certain wattage output. When the Series 6 modules failed to generate the necessary wattage, First Solar was forced to replace the modules or add additional modules to a project in order to generate the contractually-required output. Otherwise, the Company would be required to pay liquidated damages.

136. Indeed, Defendants answered direct questions from analysts about the Series 6's output and contractual obligations. For example, on February 21, 2019, an analyst from ROTH Capital Partners, LLC asked Defendant Widmar:

> Some of our checks indicated that you may be falling 5 watts per module short in your shipments to customers versus contractual requirements or obligations, and this may be resulting in extra costs. We could be wrong on this one, but wanted to just check in with you on this. Can you comment on whether or not this may or may not be happening? And if true, can you provide some color on this and perhaps talk about how long the issue may endure ahead?

137. In response, Defendant Widmar stated that he "want[ed] to make sure it's clear . . . that to the extent that the bin is slightly above or below, the contract allows for

that," and unequivocally stated that First Solar "w[as] ***not falling short of any of [its] contractual obligations*** relative to commitments to the customers on any of the product which [it] need[s] to ship to them."

138. However, this statement was false and misleading because, as explained above in Section IV.B.1.a, First Solar was falling short of its contractual obligations, causing the Company to pay liquidated damages to customers, cancel module deliveries and installations, or install additional panels in order to deliver the wattage required by its contracts.

139. Investors and analysts also relied on Defendants' representations regarding the timeline for the Series 6 cost reduction. For example, on February 25, 2019, Barclays issued an analyst report stating: "For 2019, we find management's messaging around [the] timing of [the] Series 6 . . . cost profile as helpful in setting expectations throughout the year . . . ."

140. Over the next several months, Defendants continued leading investors to believe that the Series 6 was performing well and hitting the benchmarks necessary to meet the cost per watt and watts per module targets for the Series 6. For example, during the Company's August 1, 2019 earnings call, Defendant Widmar assured investors that the Company hit its intermediate target for the Series 6 reduction, representing that First Solar had "met our first half commitment on the reduction." Defendant Widmar then explained to investors that the Series 6 saw "significant operational improvements," including the fact that "[t]he average watt per module has increased 3 watts."

141. Defendants' false and misleading representations about the Series 6 led investors to believe the Series 6 was performing well and would meet the cost per watt reduction target by the end of the year. For example, on August 2, 2019, Bank of America Merrill Lynch issued an analyst report raising its price target for First Solar's stock and noting that "[management] reaffirmed cost targets remaining on track with significant improvements across all key manufacturing metrics in 2Q . . . [and] emphasize[d] further S[eries] 6 cost reduction '20+ with a variety of levers including efficiency and utilization

improvements." Similarly, also on August 2, 2019, J.P.Morgan analyst Paul Coster raised his price target for First Solar's stock based in part on the Company's "solid execution of the Series 6 ramp."

142. A week later, on August 8, 2019, an article was published on *Seeking Alpha* titled, "First Solar's Series 6 Appears On Track To Hit Cost Targets." The article stated that "First Solar's second quarter earnings and second half guidance for 2019 suggests their new Series 6 product is on track to reach manufacturing cost targets."

### C. Defendants Misrepresent the Health and Prospects of the Project Development Division and Conceal Their Plans for Its Elimination

143. Defendants were motivated to conceal the problems with the Series 6 because, at that same time, First Solar's pipeline for its Project Development business had dwindled significantly. Nonetheless, Defendants repeatedly represented that the pipeline for Project Development was robust, and that Project Development was, and would remain, an integral component of the Company's unique "vertical integration," which purportedly gave it a leg-up on its top competitors.

144. However, contrary to Defendants' positive statements about the Project Development business, this division was actually flailing. Indeed, prior to and during the Class Period, the Project Development pipeline had all but dried up and the Systems Segment had experienced an approximately 80% decline in market share. Things within the Project Development division had gotten so bad that Defendants had quietly begun dismantling this division in early 2019, while simultaneously exploring a sale of the business. All of this information was concealed from investors.

#### 1. Defendants Knew the Project Development Business Lost Nearly All Its Market Share and Made Plans to Exit the Business

145. First Solar's Project Development market share had declined drastically leading up to, and during, the Class Period. Indeed, an in-depth analysis published by Barclays on January 15, 2020, which was based on data from the Bloomberg New Energy Finance (BNEF) database, confirmed that First Solar's Systems Segment had "lost 80%+

of its U.S. market share." As Barclays determined from its analysis, while the Company had once "captured 20% of the market," it reflected only "4% of the pipeline" as of the date of the report.

146. Specifically analyzing the Company's Project Development pipeline, Barclays discovered that for 2018, First Solar's pipeline projects represented just .6 GW of the 32.0 GW in total U.S. projects, and for 2019, the number was even smaller, at just .4 GW of the 32.5 GW in total U.S. projects. Barclays reported that it "could only find two projects" which "represent[ed] just 1% of the . . . projects announced in the U.S. in 2019." Thus, as Barclays observed with respect to "new project developments that started in 2019," the numbers were "especially low for First Solar." According to Barclays' analysis, the steep decline in First Solar's market share for Project Development began as early as 2017, with the Company's market share of new U.S. development projects decreasing markedly from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019.

147. Barclays' "core takeaway" from its analysis was that First Solar was "struggling to compete with both old and new market participants," leading Barclays to conclude that it is "unlikely that [First Solar] will be able to maintain a position among the leading U.S. downstream players." In explaining "[w]hy has First Solar lost so much market share in the U.S.?," Barclays concluded: "***First Solar has seemingly been, in large part, priced-out of the U.S. downstream solar market***."

148. Against the backdrop of the undisclosed, rapidly declining market share, which was known to Defendants at all relevant times, multiple FEs confirm that First Solar began quietly dismantling the business and internally discussing a potential sale in 2019.

149. FE 4 recalled First Solar's Project Development team stopped responding to "RFPs,"[6] and stopped bidding on jobs sometime in 2019. FE 4 explained that a Company portal called "PINS" was a repository for all project documentation for Project

[6] "RFPs" refers to requests for proposals.

Development, EPC, and O&M. FE 4 had access to PINS and noticed very little activity in the Project Development area of PINS beginning in 2019. FE 4 added that PINS showed the project lifecycle from Project Development to EPC to O&M. Prior to 2019, FE 4 noticed that the same Project Development area of PINS displayed much more activity in terms of current and upcoming projects.

150. FE 4 also explained that prior to 2019, quarterly Town Hall discussions led by Widmar and his team focused more on the Project Development pipeline, deals that were made, and sometimes the numbers associated with those deals. FE 4 recalls that beginning in 2019, no updates were given for Project Development, which FE 4 believes was a result of the inactivity of the Project Development group.

151. FE 4 also recounted that he had conversations with colleagues in Project Development, Utility and Market Origination, and Field Service at First Solar who confirmed his belief that the Company was not actively seeking new development projects.

152. FE 2 recalled that at the Company's Town Hall meetings during the first half of 2019, which he indicated were led by the Individual Defendants, there were discussions about Project Development being headed for dismantling.

153. FE 2 further stated that during the first half of 2019, Project Development was laying people off. FE 2 explained that the Project Development personnel were told in the first half of 2019 that they would need to have discussions with their managers regarding who would be kept on and who would be laid off. According to FE 2, it seemed that if a member of the Project Development team was not presently assigned to a project, then they were terminated.

154. FE 6 stated that he heard in late 2018 or early 2019 that Project Development was being shut down.

155. Similarly, FE 9 said that conversations about what the Company should look like going forward started around the March 2019 timeframe. In the course of 2019, however, those conversations turned into we're moving away from Project Development & EPC.

### 2. Defendants Mislead Investors By Touting the Strength of the Project Development Pipeline

156. At all relevant times, Defendants repeatedly represented that First Solar was meeting or exceeding the target of one GW per year in new Systems projects. For example, just before the start of the Class Period, Defendant Widmar emphasized that the Company's "potential systems opportunities remain strong at 1.8-gigawatt DC," explaining that "[t]hese potential systems bookings are comprised of projects in the U.S. and over 300 megawatts in Japan." Defendant Widmar again boasted about the strength of the Company's Systems pipeline during First Solar's second quarter 2019 earnings call on August 1, 2019, stating that First Solar's "mid- to late-stage pipeline include[d] 1.9 gigawatts of systems opportunities across U.S. and Japan."

157. Defendants also emphasized that First Solar's presence in the Project Development sector conferred a competitive advantage on the Company. Specifically, First Solar stated that "[m]any of the efficiencies, cost reductions, and capabilities that we deliver to our customers are not easily replicable for other industry participants," and further represented that its "strategies and points of differentiation," which "provide[d] the foundation for our leading industry position and enable[d] us to remain one of the preferred providers of PV solar energy solutions," included the Company's "vertically-integrated business model."

158. While promoting the robustness of the Project Development pipeline and highlighting the importance of this division in helping to differentiate the Company from its competitors, Defendants also effectively told investors that First Solar had long-term plans for the division. Specifically, during the February 21, 2019 earnings call, Defendant Widmar told the market that First Solar was making a "big investment" in the Project Development business in order to secure future projects, stating that the Company would be "investing somewhere, call it, $300 million to $400 million to secure, call it, 5 gigawatts of opportunities between now and 2023." In subsequently announcing the Company's decision to outsource its EPC business, First Solar reaffirmed its intention to maintain its

presence in the project development sphere, stating that this decision would allow the Company to continue "executing on our project development pipeline with the same level of service that our customers have come to expect."

**D. The Relevant Truth Regarding the Series 6 and Project Development Business Slowly Emerges**

**1. October 24, 2019—The Truth Regarding the Series 6 Begins to Emerge, But Defendants Continue to Mislead Investors About the Entire Story**

159. The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions regarding the Series 6 and its problems were partially revealed and/or materialized in part on October 24, 2019. On that day, during the Company's 2019 third quarter earnings call, Defendants revealed for the first time that, notwithstanding their representations that First Solar was meeting the benchmarks necessary to achieve the touted 40% reduction in cost per watt for the Series 6 by year-end 2019, the Company did not expect to meet this target and instead anticipated "exit[ing] the year approximately $0.005 higher than [the] target."

160. In the wake of the Company's October 24, 2019 disclosures to the market, the price of First Solar's common stock declined by nearly 6%, dropping over $3 per share, from a close of $55.89 on October 24, 2019, to $52.66 on October 25, 2019.

161. However, Defendants continued to mislead investors about the Series 6 by downplaying the cost reduction miss and reaffirming the Company's confidence in meeting its target, leading investors to believe that the Company would still hit the 40% reduction in the near future. During the October 24, 2019 earnings call, Defendant Widmar stated that although "there are some headwinds," the Company was "***very confident that [it'll] meet the target [they] set out for with the Series 6***." Similarly, Defendant Bradley expressed optimism with the progress of the Series 6 and stated that the Series 6 had made "***significant improvements across key manufacturing metrics and module efficiency***."

162. Thus, as of October 24, 2019, Defendants left investors completely in the dark as to ***what caused*** the Series 6 cost reduction miss or the ***full extent of the undisclosed problems*** Defendants experienced with the Series 6.

**2. January 15, 2020—Investors Begin to Learn the Truth Regarding First Solar's Project Development Business**

163. The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions regarding the Project Development business were partially revealed and/or materialized in part on January 15, 2020, when Barclays released a report disclosing for the first time the true state of First Solar's development pipeline. Specifically, Barclays revealed that while First Solar's Systems Segment had once captured "20% of the market—defined as a fully integrated development and project sale role or sometimes just as EPC provider (we est. ~1⁄4th of the time) . . . ***now they reflect just 4% of the development pipeline***."

164. In analyzing the Company's Project Development pipeline specifically, Barclays discovered that for 2018, First Solar's pipeline projects represented just .6 GW of the 32.0 GW in total U.S. projects, and for 2019, the number was even smaller, at just .4 GW of the 32.5 GW in total U.S. projects.

165. According to Barclays, the steep decline in First Solar's market share for Project Development began as early as 2017, with the Company's market share of new U.S. development projects decreasing markedly from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019. Barclays concluded that the cause for the Company's drastic decline in market share was that "First Solar has simply been unable to compete on cost."

166. Following the publication of this report, the Company's common stock fell another approximately 7%, or more than $4 per share.

167. On February 6, 2020, Barclays issued a follow-up report, "address[ing] select points of feedback" in the wake of its January 15, 2020 report. Notably, in response to the question, "*Does this [Systems] segment even matter?*," Barclays wrote: "Yes, and it even

implicitly matters to the Street and shareholders, even if they say otherwise, based on what sits in their models." In expanding on the importance of the Systems business, Barclays stated: "Systems has contributed *almost all of the gross profit* over the last several years."

168. In this follow-up report, Barclays also confirmed that the drastic decline in market share revealed by its January 15, 2020 analysis was a surprise, stating "the magnitude of the market share decline . . . surprised us," and noting that "[w]ith potentially few or no PPAs signed in 2019 . . . the standing guidance amount no longer looks reasonable by 2021."

169. Barclays also confirmed that its prior revelations regarding First Solar's market share loss and project pipeline related back to Defendants' Class Period representations regarding the Systems Segments' pipeline, and specifically, their representations regarding First Solar's annual target of one gigawatt in new Systems business. As Barclays explained with respect to First Solar's management, while "[m]aybe internally they agree" "with the decline in the Systems view," the "guidance [for the Systems Segment] is continually reiterated at 1+ GW ac." Indeed, Barclays observed that even after closing the in-house EPC business, "[m]anagement has reiterated its 1 GW ac target, emanating from the higher-margin development and sale of full project companies." Thus, as Barclays concluded, "[i]f management agrees, it has yet to be messaged to the market." Rather than "message[]" this market share decline to the market, Defendants continued to mislead investors regarding the health and longevity of the Project Development business through their material misrepresentations and omissions regarding the division's project pipeline.

170. Barclays' observations in its February 6, 2020 report demonstrate that no other market participant had already performed the same analysis and that the information in its January 15, 2020 report had not previously been disclosed to the market.

### 3. February 20, 2020—The Full Truth Is Revealed as Defendants Admit That the Series 6 Is Facing Cost Challenges and Discontinue Disclosure of Cost Per Watt Figures, and Disclose a Potential Sale of the Project Development Business

171. The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were fully revealed and/or fully materialized on February 20, 2020, when Defendants disclosed that cost challenges prevented the Company from achieving its promised cost per watt reduction.

172. Specifically, during the Company's 2019 fourth quarter and full year conference call on February 20, 2020, Defendants revealed to the market for the first time that First Solar would not realize its 2019 fleet-wide 40% cost per watt reduction goal in 2020, noting that the Company did "not anticipate to fully overcome the cost challenges experienced in 2019." Significantly, Defendants stated that "[a]cross the fleet in 2020," they anticipated "a headwind of approximately $0.01 per watt"—i.e., two times the amount by which the Company indicated it missed the 2019 target in the prior year. Defendants also attributed the Company's failure to hit its targeted 40% reduction in cost per watt in 2019 to "challenges with regard to certain aspects of the overall cost per watt."

173. During this call, Defendants further disclosed that, despite touting the Company's purported progress in improving the output of the Series 6, First Solar was still well short of its 460 watt per module midterm target for the Series 6 and would not hit this target for at least another year. Moreover, as the below slide presented by Defendant Widmar demonstrated, First Solar had barely surpassed the "expected launch" range of 430 watts per module, achieving an actual output of only 431 watts per module by the end of 2019. According to this slide, the Series 6 was not forecasted to achieve the 460 watt per module benchmark until sometime after 2020.




174. Notably, this slide and Defendants' statements revealed that over the nearly four months since the Company's October 24, 2019 earnings call, First Solar's watts per module metric had not increased, despite Defendants' representation that the efficiencies were "improving." Indeed, during the October 24, 2019 call, Defendants told investors that First Solar's "top production bin is 435 watts." Then, during the February 20, 2020 earnings call, Defendant Widmar disclosed that this number in fact had not improved, stating that by year-end 2019, the "high bin" was 435 watts and "[t]oday, our highest volume bin is 435 watts."

175. In addition, Defendant Widmar told investors during this call that the Company would not provide the market with a discrete cost per watt for its Series 6 units going forward. Widmar explained this decision by claiming that customers had "start[ed] to hold [the Company] accountable to a cost-plus model . . . [a]nd so we have purposely moved away from giving a discrete cost per watt."

176. During this call, Defendants also announced that First Solar was exploring a sale of its Project Development business, conceding that competition within the project

development sphere had increased and was impacting the Company's ability to maintain market share.

177. Following the Company's February 20, 2020 disclosures to the market, including the news of the Series 6's disappointing progress, the price of First Solar's common stock declined more than $8 per share, or nearly 15%, from a close of $59.32 per share on February 20, 2020, to close at $50.59 per share on February 21, 2020.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS[7]

### A. Misrepresentations and Omissions Concerning the Series 6

#### 1. February 21, 2019 Earnings Call

178. On February 21, 2019, after the market closed on the day before the start of the Class Period, First Solar hosted its 2018 fourth quarter and full year earnings call. During this call, in response to an industry analyst's concerns that the Company "may be falling 5 watts per module short in [its] shipments to customers versus contractual requirements or obligations, and this may be resulting in extra costs," Defendant Widmar reassured investors, stating:

> ***[W]e're not falling short of any of our contractual obligations relative to commitments to the customers on any of the product which we need to ship to them*** . . . . [T]o the extent the bin [i.e., wattage class] is actually higher or lower, then there's an adjustment to the price accordingly for that delta, could be up or could be down.

179. The statements set forth in ¶ 178 above were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, as set forth in Section IV.B above, at the time Defendant Widmar made these statements, Defendants knowingly or recklessly misrepresented, concealed, and/or failed to disclose that:

(i) There were known, widespread issues with Series 6, including (1) faulty connections that caused electrical malfunctions and resulted in module failures and even field fires (¶¶ 110-18); and (2) the Company was incurring

[7] Defendants' alleged false and misleading statements are specifically identified in this Section through the use of bold and italic text.

significant damage to the modules during shipping, with around half of the modules arriving to certain project sites broken (¶¶ 119-20).

(ii) The Series 6 modules were failing to generate the target watts per module and the output for the modules varied drastically between units. The lower-than-expected output led to wattage shortfalls that forced the Company to install additional modules at project sites to meet the contracted-for power production, pay liquidated damages, or withhold shipment altogether because the modules could not produce the necessary output (¶¶ 104-09).

(iii) The problems with the Series 6 negatively impacted both the cost per watt and the watts per module for the Series 6 (¶¶ 102-20).

By electing to speak publicly about the Series 6, including the module's ability to generate the necessary output, and thereby putting this subject into play, Defendant Widmar had a duty to fully, completely, and truthfully disclose all material facts regarding the Series 6's performance and output issues, which negatively impacted the Series 6's cost per watt and watt per module metrics, so as to not mislead investors. As a result of the foregoing undisclosed material facts, Defendant Widmar's public statements were materially false and misleading at all relevant times.

**2. August 1, 2019 Earnings Call**

180. On August 1, 2019, First Solar held its second quarter 2019 earnings call. During this call, Defendant Widmar discussed the cost per watt for the Series 6 modules and represented that First Solar had "***met our first half commitment on the reduction***," noting that there was "***a pretty steep reduction from first quarter into the second quarter***." Importantly, Defendant Widmar represented that "***we have seen significant operational improvements***" as "***[t]he average watt per module has increased 3 watts***."

181. The statements set forth in ¶ 180 above were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, as set forth in Section IV.B above, at the time Defendant Widmar made these statements, Defendants knowingly or recklessly misrepresented, concealed, and/or failed to disclose that:

(i) There were known, widespread issues with Series 6, including (1) faulty connections that caused electrical malfunctions and resulted in module failures and even field fires (¶¶ 110-18); and (2) the Company was incurring

significant damage to the modules during shipping, with around half of the modules arriving to certain project sites broken (¶¶ 119-20).

(ii) The Series 6 modules were failing to generate the target watts per module and the output for the modules varied drastically between units. The lower-than-expected output led to wattage shortfalls that forced the Company to install additional modules at project sites to meet the contracted-for power production, pay liquidated damages, or withhold shipment altogether because the modules could not produce the necessary output (¶¶ 104-09).

(iii) The problems with the Series 6 negatively impacted both the cost per watt and the watts per module for the Series 6 (¶¶ 102-20).

By electing to speak publicly about the Series 6, including the cost per watt and watts per module figures and the operational improvements for the module, and thereby putting these subjects into play, Defendant Widmar had a duty to fully, completely, and truthfully disclose all material facts regarding the Series 6's performance and output issues, which negatively impacted the Series 6's cost per watt and watt per module metrics, so as to not mislead investors. As a result of the foregoing undisclosed material facts, Defendant Widmar's public statements were materially false and misleading at all relevant times.

**3. October 24, 2019 Earnings Call**

182. The truth regarding the Series 6 modules was partially revealed on October 24, 2019, when Defendants disclosed for the first time that First Solar would not meet the touted 40% reduction in cost per watt by year-end 2019. However, during the third quarter 2019 earnings call that day, Defendants continued to mislead investors concerning the Series 6 cost per watt target, stating:

> Relative to our expectations for Q3, we are pleased with the progress made and are ***slightly ahead of the road map laid out during the 2018 year-end earnings call*** which took place in February.

183. Defendant Widmar also again touted the "***significant operational improvements***" for the Series 6, including the fact that "***[t]he average watt per module has increased 4 watts***."

184. In summarizing "the key messages from our call today," Defendant Bradley stated that "we continue to be pleased with the progress of our Series 6 platform, ***including the significant improvements across key manufacturing metrics and module efficiency***."

185. Responding to a question from an industry analyst from Bank of America Merrill Lynch about "further cost reduction" for the Series 6 and the Company's ability to meet its cost per watt target, Defendant Widmar stated that while "***there are some headwinds[,] . . . we're very confident that we'll meet the target that we set out for with Series 6***."

186. The statements set forth in ¶¶ 182-85 above were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, as set forth in Section IV.B above, at the time Defendants Widmar and Bradley made these statements, Defendants knowingly or recklessly misrepresented, concealed, and/or failed to disclose that:

(i) There were known, widespread issues with Series 6, including (1) faulty connections that caused electrical malfunctions and resulted in module failures and even field fires (¶¶ 110-18); and (2) the Company was incurring significant damage to the modules during shipping, with around half of the modules arriving to certain project sites broken (¶¶ 119-20).

(ii) The Series 6 modules were failing to generate the target watts per module and the output for the modules varied drastically between units. The lower-than-expected output led to wattage shortfalls that forced the Company to install additional modules at project sites to meet the contracted-for power production, pay liquidated damages, or withhold shipment altogether because the modules could not produce the necessary output (¶¶ 104-09).

(iii) The problems with the Series 6 negatively impacted both the cost per watt and the watts per module for the Series 6 (¶¶ 102-20).

By electing to speak publicly about the Series 6, including the cost per watt and watts per module figures, operational improvements, and "headwinds" impacting the module, and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding the Series 6's performance and output issues, which negatively impacted the Series 6's cost per watt and watt per module metrics, so as

to not mislead investors. As a result of the foregoing undisclosed material facts, Defendant Widmar's and Defendant Bradley's public statements were materially false and misleading at all relevant times.

**B. Misrepresentations and Omissions Concerning Project Development**

**1. February 21, 2019 Earnings Call**

187. During First Solar's 2018 fourth quarter and year-end earnings conference call on February 21, 2019, Defendant Widmar touted the Company's Systems pipeline, stating that "***with the more than 300 megawatts of recent systems bookings, our potential systems opportunities remain strong at 1.8-gigawatt DC***" and further explaining that "***[t]hese potential systems bookings are comprised of projects in the U.S. and over 300 megawatts in Japan***."

188. Later during this call, Defendant Widmar responded to a question from an Oppenheimer industry analyst regarding opportunities for the "systems business in the U.S.," stating:

> [L]et me go to the systems question first. I think and particularly in the U.S., there is a lot that's in the market right now. As you can see, there's a lot of, I'll call it, smaller developers and others that are trying to actively market and to sell their development pipeline. Some with contracted assets, some not. And I do think that some of that could be related to the capacity of some of the smaller developers to make the investments to capture the ITC safe harbor. We indicated in our last call, ***we'll be investing somewhere, call it, $300 million to $400 million to secure, call it, 5 gigawatts of opportunities between now and 2023. That's a big investment, and I think some of the smaller developers may be constrained with making those investments***. And I think they understand that if they don't make those investments, they'll be less competitive as they're competing for projects that have CODs that go through the end of 2023. . . . [W]e've got a great development team, and we've proven ourselves with our ability to make acquisitions and integrate development assets and contract them and realize meaningful value associated with that. So that's a good opportunity for us.

189. The statements set forth in ¶¶ 187-88 above were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, as set forth in Section IV.C above, at the time Defendant Widmar made these statements,

Defendants knowingly or recklessly misrepresented, concealed, and/or failed to disclose that:

(i) The Systems Segment had lost at least 80% of its market share (¶¶ 145, 163).

(ii) The Project Development business's pipeline of new contracts had dwindled significantly and the Company's market share based on new projects had declined drastically—dropping from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019 (¶¶ 146, 164-65).

(iii) Defendants had stopped bidding on Project Development projects and responding to RFPs in 2019 with very little activity reflected in the Project Development area of the Company's PINS system beginning in 2019 (¶¶ 149-51).

(iv) Things had gotten so bad that Defendants had begun dismantling the Project Development business and laying off personnel in this division in the first half of 2019 (¶ 153).

(v) Defendants were internally discussing a potential sale of the Project Development business by no later than early 2019 (¶¶ 152, 154-55).

By electing to speak publicly about the Project Development business and the pipeline for the Systems Segment—and thereby putting these subjects into play—Defendant Widmar had a duty to fully, completely, and truthfully disclose all material facts regarding the Project Development business's dwindling operations and First Solar's decision to dismantle the business and explore a potential sale, so as to not mislead investors. As a result of the foregoing, undisclosed material facts, Defendant Widmar's public statements were materially false and misleading at all relevant times.

**2. May 2, 2019 Earnings Call**

190. During First Solar's first quarter 2019 earnings call on May 2, 2019, Defendant Widmar reported with respect to the Company's Systems pipeline that First Solar's "***mid- to late-stage pipeline includes approximately 900 megawatts of systems opportunities across the U.S. and Japan***."

191. The statement set forth in ¶ 190 above was materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, as set forth

in Section IV.C above, at the time Defendant Widmar made this statement, Defendants knowingly or recklessly misrepresented, concealed, and/or failed to disclose that:

(i) The Systems Segment had lost at least 80% of its market share (¶¶ 145, 163).

(ii) The Project Development business's pipeline of new contracts had dwindled significantly and the Company's market share based on new projects had declined drastically—dropping from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019 (¶¶ 146, 164-65).

(iii) Defendants had stopped bidding on Project Development projects and responding to RFPs in 2019 with very little activity reflected in the Project Development area of the Company's PINS system beginning in 2019 (¶¶ 149-51).

(iv) Things had gotten so bad that Defendants had begun dismantling the Project Development business and laying off personnel in this division in the first half of 2019 (¶ 153).

(v) Defendants were internally discussing a potential sale of the Project Development business by no later than early 2019 (¶¶ 152, 154-55).

By electing to speak publicly about the pipeline for the Systems Segment—and thereby putting this subject into play—Defendant Widmar had a duty to fully, completely, and truthfully disclose all material facts regarding the Project Development business's dwindling operations and First Solar's decision to dismantle the business and explore a potential sale, so as to not mislead investors. As a result of the foregoing, undisclosed material facts, Defendant Widmar's public statement was materially false and misleading at all relevant times.

### 3. August 1, 2019 Earnings Call

192. During First Solar's second quarter 2019 earnings call on August 1, 2019, Defendant Widmar highlighted the "***significant increase in systems opportunities***," and represented that First Solar's "***mid- to late-stage pipeline include[d] 1.9 gigawatts of systems opportunities across U.S. and Japan***."

193. The statements set forth in ¶ 192 above were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, as set forth

in Section IV.C above, at the time Defendant Widmar made these statements, Defendants knowingly or recklessly misrepresented, concealed, and/or failed to disclose that:

(i) The Systems Segment had lost at least 80% of its market share (¶¶ 145, 163).

(ii) The Project Development business's pipeline of new contracts had dwindled significantly and the Company's market share based on new projects had declined drastically—dropping from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019 (¶¶ 146, 164-65).

(iii) Defendants had stopped bidding on Project Development projects and responding to RFPs in 2019 with very little activity reflected in the Project Development area of the Company's PINS system beginning in 2019 (¶¶ 149-51).

(iv) Things had gotten so bad that Defendants had begun dismantling the Project Development business and laying off personnel in this division in the first half of 2019 (¶ 153).

(v) Defendants were internally discussing a potential sale of the Project Development business by no later than early 2019 (¶¶ 152, 154-55).

By electing to speak publicly about the opportunities and pipeline for the Systems Segment—and thereby putting these subjects into play—Defendant Widmar had a duty to fully, completely, and truthfully disclose all material facts regarding the Project Development business's dwindling operations and First Solar's decision to dismantle the business and explore a potential sale, so as to not mislead investors. As a result of the foregoing, undisclosed material facts, Defendant Widmar's public statements were materially false and misleading at all relevant times.

**4. September 19, 2019 Press Release**

194. On September 19, 2019, First Solar issued a press release announcing that it would be transitioning to leveraging third-party EPC services. In discussing the decision to outsource the EPC business, Defendant Widmar reassured investors that the move would not impact the Project Development business, stating: "We expect that this shift will allow us to concentrate on our core business of scaling, developing, and selling our world-class

module technology ***while executing on our project development pipeline with the same level of service that our customers have come to expect***."

195. The statement set forth in ¶ 194 above was materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, as set forth in Section IV.C above, at the time Defendant Widmar made this statement, Defendants knowingly misrepresented, concealed, and/or failed to disclose that:

(i) The Systems Segment had lost at least 80% of its market share (¶¶ 145, 163).

(ii) The Project Development business's pipeline of new contracts had dwindled significantly and the Company's market share based on new projects had declined drastically—dropping from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019 (¶¶ 146, 164-65).

(iii) Defendants had stopped bidding on Project Development projects and responding to RFPs in 2019 with very little activity reflected in the Project Development area of the Company's PINS system beginning in 2019 (¶¶ 149-51).

(iv) Things had gotten so bad that Defendants had begun dismantling the Project Development business and laying off personnel in this division in the first half of 2019 (¶ 153).

(v) Defendants were internally discussing a potential sale of the Project Development business by no later than early 2019 (¶¶ 152, 154-55).

By electing to speak publicly about the pipeline for the Project Development business—and thereby putting this subject into play—Defendant Widmar had a duty to fully, completely, and truthfully disclose all material facts regarding the Project Development business's dwindling operations and First Solar's decision to dismantle the business and explore a potential sale, so as to not mislead investors. As a result of the foregoing, undisclosed material facts, Defendant Widmar's public statement was materially false and misleading at all relevant times.

### 5. October 24, 2019 Earnings Call

196. As explained above, the truth regarding the Series 6 modules was partially revealed during First Solar's third quarter 2019 earnings call on October 24, 2019.

However, Defendants continued misleading investors about the Project Development business. For example, Defendant Widmar stated with respect to the Company's Systems pipeline:

> ***In terms of segment mix, our mid- to late-stage pipeline includes approximately 2 gigawatts of systems opportunities across the United States and Japan . . . . Our energy systems business continues to perform strongly with an additional 1 gigawatt contracted since our previous earnings call.*** This brings new bookings in 2019 to 2.6 gigawatts and our total energy services portfolio under – of assets under contract to nearly 14 gigawatt[] levels.

197. The statements set forth in ¶ 196 above were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, as set forth in Section IV.C above, at the time Defendant Widmar made these statements, Defendants knowingly or recklessly misrepresented, concealed, and/or failed to disclose that:

(i) The Systems Segment had lost at least 80% of its market share (¶¶ 145, 163).

(ii) The Project Development business's pipeline of new contracts had dwindled significantly and the Company's market share based on new projects had declined drastically—dropping from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019 (¶¶ 146, 164-65).

(iii) Defendants had stopped bidding on Project Development projects and responding to RFPs in 2019 with very little activity reflected in the Project Development area of the Company's PINS system beginning in 2019 (¶¶ 149-51).

(iv) Things had gotten so bad that Defendants had begun dismantling the Project Development business and laying off personnel in this division in the first half of 2019 (¶ 153).

(v) Defendants were internally discussing a potential sale of the Project Development business by no later than early 2019 (¶¶ 152, 154-55).

By electing to speak publicly about the pipeline for the Systems Segment, the success of the Project Development business over the next decade, and the competitiveness of the division—and thereby putting these subjects into play—Defendant Widmar had a duty to fully, completely, and truthfully disclose all material facts regarding the Project

Development business's dwindling operations and First Solar's decision to dismantle the business and explore a potential sale, so as to not mislead investors. As a result of the foregoing, undisclosed material facts, Defendant Widmar's public statements were materially false and misleading at all relevant times.

## VI. ALLEGATIONS OF LOSS CAUSATION

198. During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of First Solar common stock and operated as a fraud or deceit on Class Period purchasers of First Solar common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

199. The market for First Solar's common stock was open, well-developed, and efficient at all relevant times. Throughout the Class Period, the price of First Solar's common stock was artificially inflated as a direct result of Defendants' material misstatements and omissions regarding: (i) the Series 6 cost per watt and watts per module metrics, and the significant manufacturing and reliability issues plaguing the Series 6 modules that contributed to the Company's failure to hit its targets for both of these metrics; and (ii) the Project Development business's dwindling market share and the Company's decision to dismantle the division and explore its sale. *See supra* Sections IV.B-C. The false and misleading statements and omissions set forth above were widely disseminated to the securities markets, investment analysts, and the investing public.

200. Class members unknowingly and in reliance on the integrity of the Company's stock price, which reflected Defendants' materially false or misleading statements and/or omissions, purchased First Solar common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Lead Plaintiffs and other Class members would not have purchased First Solar stock at the artificially inflated prices at which it traded during the Class Period.

201. The true facts became known and/or the materialization of the risks that had been concealed by Defendants occurred through partial public disclosures on October 24, 2019, January 15, 2020, and February 20, 2020. As a result of these disclosures, First

Solar's stock declined precipitously as the artificial inflation was removed from the market price of the stock, causing substantial damage to Lead Plaintiffs and other members of the Class.

202. As detailed below, the information disclosed on October 24, 2019, January 15, 2020, and February 20, 2020, was both related to and the foreseeable consequence of the relevant truth that Defendants misrepresented and concealed from investors during the Class Period—namely that: (i) the Series 6 modules were suffering from myriad manufacturing and performance defects that negatively impacted First Solar's cost per watt and watts per module figures and ultimately contributed to the Company's failure to hit its targets for these two metrics; and (ii) the Systems Segment had lost more than 80% of its market share, with the project pipeline for the Project Development business dwindling drastically, and the Company had begun dismantling this business and exploring its sale.

203. It was not until the final partial disclosure and/or materialization of a concealed risk on February 20, 2020, that the full truth was known to the market and/or the full risk concealed by Defendants' misrepresentations materialized, such that there was no longer any artificial inflation in First Solar's stock price attributable to the fraud.

204. The declines in First Solar's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

205. As a result of their purchases of First Solar's common stock during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss (i.e., damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused First Solar common stock to trade at artificially inflated levels throughout the Class Period.

206. The economic loss suffered by Lead Plaintiffs and the other Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate

the price of First Solar common stock and the subsequent decline in the value of First Solar common stock when information that corrected Defendants' misrepresentations or omissions was revealed and/or the risks concealed by Defendants' material misrepresentations or omissions materialized.

207. Lead Plaintiffs and other Class members purchased First Solar common stock relying on the integrity of the market relating to First Solar common stock and suffered economic damages as a result thereof.

208. The stock price declines immediately following the October 24, 2019, January 15, 2020, and February 20, 2020 disclosures were substantially, if not wholly, caused by the revelation of the relevant truth and/or the materialization of the risks that had been concealed by Defendants' fraud. The timing and magnitude of First Solar's stock price declines evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the losses suffered by Lead Plaintiffs and other Class members were caused by changed market conditions or macroeconomic, industry, or Company-specific facts unrelated to Defendants' fraudulent conduct.

**A. October 24, 2019 Earnings Call**

209. On October 24, 2019, First Solar held its third quarter 2019 earnings call. During this call, Defendants revealed to the market for the first time that notwithstanding their representations that First Solar was meeting the benchmarks necessary to achieve the touted 40% reduction in the Series 6 cost per watt by year-end 2019, the Company did not expect to meet this target and instead anticipated "exit[ing] the year approximately $0.005 higher than [the] target."

210. As alleged above (Section IV.B.1), the undisclosed manufacturing and performance issues plaguing the Series 6 modules negatively impacted both the cost per watt and watts per module metrics, and thus ultimately contributed to the Company's failure to achieve the 40% cost per watt reduction.

211. In the wake of Defendants' October 24, 2019 revelation, analysts zeroed in on the Company's inability to achieve the 2019 cost per watt target. For example, in an October 25, 2019 report, Credit Suisse wrote: "**Bottom-line – Series-6 production on target, cost reduction slightly behind**." As Credit Suisse further explained: "The larger focus for us was Series-6 cost reduction which had some positives . . . but some delays . . . leading to a module cost $0.005/W above the company's expectation for the year." Oppenheimer similarly wrote in an October 25, 2019 report that "[m]anagement also indicated Series 6 cost/W was likely to be $0.005/W higher than 2019 plan . . . ." Analysts were also focused on the Company's positive representations regarding the increasing output for the Series 6 modules, with Cowen noting in an October 25, 2019 report that "[t]he operational performance of Series 6 is improving . . . with . . . watt/module . . . increasing."

212. The Company's October 24, 2019 disclosures caused the price of First Solar's common stock to decline by nearly 6%, or more than $3 per share, from a close of $55.89 on October 24, 2019 to $52.66 on October 25, 2019.

**B. January 15, 2020 Barclays Report**

213. On January 15, 2020, Barclays disclosed to the public for the first time the truth about the diminishing market share commanded by First Solar's Systems Segment. Barclays uncovered these facts only through an in-depth review of a Bloomberg database and corroborating data points from First Solar's own SEC filings. Specifically, Barclays' analysts "combed through and corrected the [Bloomberg New Energy Finance] database to account for company acquisitions, multiple company names" and "corroborated [First Solar's] data points" from its Forms 10-Q and 10-K filings. Barclays then isolated non-operational projects to represent the current development pipeline.

214. Through this detailed analysis, Barclays analysts were able to determine that while First Solar's Systems Segment had once captured "20% of the market—defined as a fully integrated development and project sale role or sometimes just as EPC provider (we est. ~1⁄4th of the time) . . . ***now they reflect just 4% of the development pipeline***."

215. Specifically analyzing the Company's Project Development pipeline, Barclays discovered that for 2018, First Solar's pipeline projects represented just .6 GW of the 32.0 GW in total U.S. projects, and for 2019, the number was even smaller, at just .4 GW of the 32.5 GW in total U.S. projects. Barclays reported that it "could only find two projects" which "represent[ed] just 1% of the . . . projects announced in the U.S. in 2019." Thus, as Barclays observed with respect to "new project developments that started in 2019," the numbers were "especially low for First Solar." Barclays explained that even if "some new [2019] developments are missing . . . the data would tell the same story: First Solar is coasting on its old pipeline (which includes many old development assets)."

216. Indeed, according to Barclays' analysis, the steep decline in First Solar's market share for Project Development began as early as 2017, with the Company's market share of new U.S. development projects decreasing markedly from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019. Barclays concluded that the cause for the Company's drastic decline in market share was that "First Solar has simply been unable to compete on cost."

217. Barclays also confirmed that First Solar's market share loss was not known to investors, stating that the dwindling market share is "unobservable in 10Q/Ks." As Barclays explained, "[t]he lag caused from development timelines and the ensuing timing of projects reaching [Commercial Operation Date] has obfuscated FSLR's go-forward share loss," and further stated: "Given projects are still being brought online related to past developments, this has obfuscated the underlying trend of First Solar losing most of its market share going forward." In addition, Barclays similarly noted: "[G]iven long development timelines, FSLR still has a leading share of project CODs in 2019. This is primarily why we and the Street have missed the rapid decline in share."

218. Barclays' January 15, 2020 revelations regarding First Solar's Systems market share and the new project pipeline for its Project Development division related directly to Defendants' misrepresentations and omissions concerning the development pipeline. Indeed, as Barclays explained its February 6, 2020 follow-up report, Defendants

had yet to "message[]" this market share decline "to the market" given that "guidance [for the Systems segment] is continually reiterated at 1+ GW ac." As this report confirms, Defendants' Class Period representations that they were meeting or exceeding their target of one gigawatt per year in new Systems projects concealed from investors material facts regarding the Company's significant loss of market share and its rapidly dwindling Project Development pipeline.

219. This news caused the Company's stock to decline $4.03 per share, or nearly 7%, from a close of $58.78 on January 14, 2020, to close at $54.75 per share on January 15, 2020.

**C. February 20, 2020 Earnings Call**

220. On February 20, 2020, First Solar held its fourth quarter and full year 2019 earnings conference call. During this call, Defendants announced for the first time that First Solar would not realize its 2019 fleet-wide cost per watt goal in 2020, stating that the Company did "not anticipate to fully overcome the cost challenges experienced in 2019" and instead it expected a fleet-wide headwind of $0.01 per watt in 2020.

221. Defendants also confirmed that First Solar had missed the 2019 cost per watt target and disclosed for the first time that its failure to achieve this target was due to "challenges with regard to certain aspects of the overall cost per watt."

222. In addition, Defendant Widmar stated that the Company would not disclose a discrete cost per watt for its Series 6 units going forward. When asked by an industry analyst from Credit Suisse to explain this decision, Defendant Widmar claimed that customers had "start[ed] to hold [the Company] accountable to a cost-plus model . . . and so we have purposely moved away from giving a discrete cost per watt."

223. Finally, Defendants also disclosed that First Solar was still well short of its 460 watt per module midterm target for the Series 6 and would not hit this target for at least another year. Specifically, as demonstrated by the below slide, First Solar had barely surpassed the "Expected Launch" range of 430 watts per module, achieving an actual output of only 431 watts per module by the end of 2019. According to this slide, the Series 6 was not forecasted to achieve the touted 460 watt per module benchmark until sometime after 2020.




224. Notably, this slide and Defendants' statements revealed to investors for the first time that in the four months since the Company's October 24, 2019 earnings call, First Solar's watts per module metric did not improve. Indeed, during the October 24, 2019 call, Defendants told investors that First Solar's "top production bin is 435 watts." Then, during the February 20, 2020 earnings call, Defendant Widmar disclosed that by year-end 2019, the "high bin" was still 435 watts and "[t]oday, our highest volume bin is 435 watts."

225. As alleged above (Section IV.B.1), the undisclosed manufacturing and performance issues plaguing the Series 6 modules negatively impacted both the cost per watt and watts per module metrics, and thus ultimately contributed to the Company's

failure to achieve the 40% cost per watt reduction, as well as its failure to hit the midterm watts per module target and its stalled progress in increasing this output figure.

226. On this call, Defendant Widmar also revealed that the Company was exploring a sale of its Project Development business. Specifically, Widmar stated:

> [W]e are working with an adviser to evaluate strategic options to best position our U.S. development business with a mandate to position the business to succeed in the continuing evolving market for solar generation assets, while maximizing value for First Solar shareholders.
>
> While we are open to partnering with a third-party who possesses complementary competencies and capital to further scale the business, the pursuit of a partnership could potentially result in a complete sale of the U.S. development business.

227. In explaining this decision, Defendant Widmar admitted that the Project Development business had been negatively impacted by competition, stating, "[c]ompetition within the development market has increased."

228. These disclosures caused First Solar's stock price to decline $8.73 per share, or nearly 15%, from a close of $59.32 per share on February 20, 2020, to close at $50.59 per share on February 21, 2020.

229. Analyst reports issued in the wake of First Solar's February 20, 2020 earnings call confirm that investors were surprised by the Company's abrupt disclosure that it was considering a sale of its Project Development business and concerned about the Company's disappointing cost per watt numbers. For example, in a February 21, 2020 analyst report, Barclays reported that "[a]s part of 2020 guidance, FSLR disclosed that it's potentially selling the [Systems] business altogether," which Barclays noted was "ahead of our expectations," explaining that "[w]e had credited an ability to bring . . . 1-2 more years of 1 GW ac p.a." Based on the Company's disclosures about its cost per watt, Barclays estimated "an implied Series 6 underlying cost of around $0.25-$0.27 per watt in 4Q19," explaining that "[t]his demonstrates the challenges ahead at first reaching the ~$0.22/W initial target, let alone the new roadmap of incremental cost reductions." In a February 21, 2020 report, Zacks also commented on the Company's cost per watt disclosure, listing

among the "[r]easons [t]o [s]ell" that: (i) "the company faced challenges with regard to certain aspects of the overall cost per watt"; (ii) "throughout 2020 . . . First Solar does not expect to fully overcome the cost challenges that it experienced in 2019"; and (iii) there will be "a headwind of approximately 1 cent per watt for First Solar across the fleet in 2020."

230. As a result of Defendants' misstatements and omissions, which were corrected by the disclosures discussed above, the price of First Solar common stock ended the Class Period at $50.59, nearly 25% below its Class Period high of $67.31 on September 23, 2019.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

231. As detailed above, the Individual Defendants were directly involved in and participated in both the management and day-to-day operations of the Company at its highest levels. Each had, at all relevant times, unfettered access to detailed information concerning the issues with the Series 6 modules, as well as the Project Development business's dwindling market share and the Company's decision to dismantle the business and explore a potential sale. This information was transmitted and learned through meetings, reports, and other regular communications, as reported by multiple FEs. And, as detailed in Section V above, Defendants' knowledge of the undisclosed performance defects and wattage issues with the Series 6 and the faltering Project Development business is apparent from Defendants' repeated and specific public statements made throughout the Class Period regarding the Series 6 module and the Project Development division.

232. In addition to the facts alleged above, regarding First Solar's and the Individual Defendants' personal knowledge and/or reckless disregard of the materially false misrepresentations and omissions, Defendants' scienter is evidenced by the specific facts discussed below.

**A. Core Operations Allegations: The Series 6 Solar Module and Project Development Business Were Core to the Company's Operations**

233. The importance of the Modules Segment—specifically the Series 6 module—and the Project Development business to First Solar's overall business raises a strong inference that Defendants knew, or were deliberately reckless in not knowing or disregarding, that their statements about the Series 6 modules and the Company's Project Development business were false or misleading and/or omitted material facts.

**1. The Series 6 Module Accounted for Nearly Half of First Solar's Revenue During the Class Period and Its Success Was Critical to the Company's Future**

234. The Individual Defendants' knowledge of the Series 6 problems—including the fact that those problems negatively impacted the Series 6's output and cost per watt metrics—is demonstrated by the fact that the Series 6 was critically important to the Company's operations. Specifically, the Modules Segment was among First Solar's chief revenue generators during the Class Period. Of First Solar's $3.063 billion in total net sales in 2019, solar modules accounted for $1.460 billion (or approximately 47% of net sales).

235. The Modules Segment was also the Company's primary source of sales growth during the Class Period, recording a year-over-year net sales increase of 191% in 2019. Indeed, the Company stated that increased module production in 2019 was "primarily driven by the incremental Series 6 production capacity" and that the Series 6 accounted for approximately 65% of all gigawatts the Company produced in 2019.

236. Moreover, the Series 6 was critical to the Company's survival, as First Solar needed to reduce costs to keep up with its competitors—specifically Chinese firms which were offering cheaper and more efficient solar modules. For example, as Morningstar wrote in an August 6, 2019 analyst report:

> Solar energy has a long growth runway worldwide with falling costs and the move toward cleaner energy. However, First Solar must stay ahead of a large pack of competitors by reducing panel costs and increasing efficiency. . . .

> Solar module makers like First Solar differentiate themselves on cost and efficiency rate—modules' ability to turn sun into electricity. First Solar was a leader in both several years ago, but it has lost its cost advantage, primarily to Chinese firms. The industry's worldwide manufacturing capacity exceeds demand, creating a price war that is likely to persist.
>
> Maintaining margins and staying ahead of the competition will require First Solar to invest continually in new technology and production capacity.

237. Therefore, First Solar needed to create a cheaper, more efficient module or risk losing a pricing war with its competitors.

238. As Defendant Widmar explained in a November 16, 2016 press release, "[t]he acceleration of the Series 6 roadmap is an important development for First Solar" and "we expect the transition to Series 6 will enable us to maximize the intrinsic cost advantage of [First Solar's] thin-film technology" when compared to more traditional solar panel technology. Similarly, during First Solar's Analyst Day conference call on December 5, 2017, Defendant Widmar told investors the "Series 6 is going to give us a differentiated product and a position of strength, which we now can evaluate, how we want to engage the market, and how we think about capacity expansion."

239. Indeed, industry analysts understood the importance of the Company's transition to the Series 6. For example, on August 2, 2019, J.P.Morgan issued an analyst report discussing the importance of executing on the Series 6 cost reduction, stating that with the "successful transition to Series 6 production, FSLR could have a sustainable competitive advantage in the global solar PV panel market, which could fuel profitable growth over the longer-term." Moreover, J.P.Morgan explained how the Series 6 cost reductions could positively impact margins, stating that First Solar's "gross margins increased dramatically, up 13.2pct pts q/q, owing to improved Series 6 volumes, capacity utilization, yield and watts per module."

### 2. The Project Development Business Was a Key Part of the Company's Lauded Vertical Integration Model

240. The Project Development business was also among First Solar's chief revenue generators during the Class Period. The solar power systems, which included the

Project Development business, accounted for $1.149 billion in net sales in 2019, or more than 37% of the Company's total net sales that year.

241. Indeed, Barclays noted the significance of the Project Development business in its January 15, 2020 report. Specifically, Barclays emphasized the importance of the Systems business, which included the Project Development segment, stating: "This is where most of the multi-year gross profit emanates, irrespective of manufacturing's booms and (and mostly) busts." Barclays further noted that "[a]s *we've stressed since our initiation (1/7/19)*, FSLR's value proposition is premised on a robust balance sheet ($1.5+ bn net cash), and through-cycle support from project development."

242. Moreover, throughout the Class Period, Defendants continuously represented that the Project Development was an integral part of the Company's unique vertically integrated business model, whereby First Solar generated income not only through the manufacture and sale of solar panels, but also through the creation of Project Development sites. Indeed, Defendants routinely touted their vertically integrated business model as a competitive advantage. For example, First Solar's 2019 Form 10-K emphasized the purported benefits of the Company's vertically integrated structure:

> ***Vertical Integration***
>
> We are vertically integrated across substantially the entire solar value chain. Many of the efficiencies, cost reductions, and capabilities that we deliver to our customers are not easily replicable for other industry participants that are not vertically integrated in a similar manner. Accordingly, our operational model offers PV solar energy solutions that benefit from our wide range of capabilities, including advanced PV solar module manufacturing, project development, engineering and plant optimization, grid integration and plant control systems, procurement and construction services, and O&M services.

243. Similarly, First Solar's annual proxy statement on Form DEF 14A, filed with the SEC on April 3, 2019, stated:

> We believe that our strategies and points of differentiation, which include our advanced module and system technologies, our manufacturing process, our vertically-integrated business model, our financial viability, and the sustainability of our modules and systems, provide the foundation for our

> leading industry position and enable us to remain one of the preferred providers of PV solar energy solutions.

244. In the months leading up to the Class Period, Defendants repeatedly boasted about the advantages of the Company's vertically-integrated business structure—confirming the importance of the Project Development business to First Solar's strategy and profitability. For example, during the 2017 Analyst Day Call, Defendant Widmar explained that "the reason we wanted to be in development as well as within EPC is it allows us to optimize the value chain, it allows us to be an influencer, it allows us to drive cost out." Defendant Bradley similarly emphasized the Company's commitment to its vertically integrated structure and the Project Development business during the Analyst Day Call, stating: "I want to be very clear . . . We are in no way exiting the development or EPC businesses[;] . . . we are very much in the development game. ***It is core to our strategy as is the EPC business in the U.S.***"

**B. Defendants' Statements Themselves Support Scienter**

245. As discussed above, the Individual Defendants spoke at length during the Class Period about the Series 6 and the Project Development business.

246. The Individual Defendants continuously discussed the Company's progress on achieving the cost per watt and output improvements for the Series 6, telling investors at every stage of the Class Period that the Series 6 was performing well and hitting the benchmarks necessary to reduce cost per watt by 40%. For example, on August 1, 2019, Defendants stated that they "***met our first half commitment on the [Series 6 cost per watt] reduction***."

247. Similarly, Defendants provided updates on the improvements they were seeing with the Series 6. For example, on August 1, 2019, Defendant Widmar stated:

> On a fleet-wide basis, since April, ***we have seen significant operational improvements***. When comparing performance for the month of April to July, meaningful improvement can be seen. Megawatts produced per day is up 16%. Capacity utilization has increased 12 percentage points to 94%. Adjusted for plant downtime, the fleet capacity utilization was 96%. Note, in support of our module efficiency road map in July, we increased the volume of engineering test articles, which adversely impacted capacity

> utilization by 1 percentage point. The production yield is up 2 percentage points to 91%. ***The average watt per module has increased 3 watts***. And finally, the percentage of modules produced with antireflective coating has increased by 5 percentage points to 91%. The combination of our efficiency improvement program and increased ARC utilization has led to a significant improvement in the module bin distribution. In July, the ARC bin distribution between 420-watt through 430-watt modules represented 87% of production.

248. Indeed, Defendants routinely answered direct questions from analysts about the Series 6's cost per watt. For example, during First Solar's earnings call on August 1, 2019, an analyst from ROTH Capital Partners asked Defendant Widmar:

> I have three. The first one is recall the slide that you guys put out back in Q4 of '18. I think it's Slide 12 where you had your average cost per watt. And Q1 was 30% above that; Q2, 5% above that; and then Q4 of '19 was expected to be 10% below average for the year. Can you guys just give us an update as to where things stand relative to that? Mark, I know that you talked about meeting your objectives and so forth. How does things stand relative to that? First. And then secondarily, as it relates to the bookings, how are bookings looking into 2022 with this bifacial exemption? Are customers starting to look more closely to book bifacial offerings by your peers? And then finally, can you give us an update on your view of -- your latest view on capacity expansion and, in general, maybe shareholder capital -- capital allocation in general?

249. In response, Defendant Widmar stated:

> All right, Phil, on the cost per watt, and -- what I did say in my prepared remarks was that we're happy with where we are right now. We ***met our first half commitment on the reduction***. And as you remember, we had ***a pretty steep reduction from first quarter into the second quarter***, so we're happy with the first half results.

250. Defendants even went so far as to soothe investor concerns over any problems with the Series 6. For example, on February 21, 2019, an analyst asked about the Series 6's watts per module because "[s]ome of [their] checks indicated that [First Solar] may be falling 5 watts per module short in [First Solar's] shipments to customers . . . and this may be resulting in extra costs." In response, Defendant Widmar downplayed any concerns over falling short of contractual obligations and unequivocally stated that "***we're***

***not falling short of any of our contractual obligations relative to commitments to the customers on any of the product which we need to ship to them***."

251. These false and misleading statements, and ones like them, establish that Defendants were aware of or, at the very least, were reckless in not knowing about the Series 6 issues, which negatively impacted the Series 6's cost per watt and output metrics.

252. Put starkly, either: (a) Defendants ***knew*** of what they spoke, or (b) they chose to speak definitively and confidently to investors, analysts, and the market regarding a subject they had no basis to speak about, which is reckless. Either prong establishes Defendants' scienter.

253. Similarly, throughout the Class Period, Defendants routinely represented that the pipeline for the Project Development business, which was part of the Systems Segment, was robust—assuring investors that the Company was continuing to "execut[e] on [its] project development pipeline." For example, just before the start of the Class Period, Defendant Widmar emphasized that the Company's "potential systems opportunities ***remain strong*** at 1.8-gigawatt DC," explaining that "[t]hese potential systems bookings are comprised of projects in the U.S. and over 300 megawatts in Japan."

254. Defendant Widmar again boasted about the strength of the Company's Systems pipeline during First Solar's second quarter 2019 earnings call on August 1, 2019, stating that First Solar's "mid- to late-stage pipeline include[d] 1.9 gigawatts of systems opportunities across U.S. and Japan." Then again on October 24, 2019, Defendant Widmar touted the Company's pipeline, stating that the Company's "energy systems business continues to perform strongly with an additional 1 gigawatt contracted since our previous earnings call."

255. These false and misleading statements, and ones like them, provide a strong inference that Defendants were aware of or, at the very least, were reckless in not knowing that the Systems Segment had lost at least 80% of its market share and things had gotten so bad that Defendants had already begun dismantling the Project Development business and exploring a potential sale.

### C. Defendants' Knowledge and Reckless Disregard of Misstatements Regarding the "Series 6" Solar Module

256. Defendants' knowledge of or reckless disregard for the undisclosed Series 6 problems is further evidenced by the reports of FEs. For example, FE 9—who worked with Defendant Widmar, who was a mentor to him—said that Defendant Widmar knew about the issues with the Series 6 modules.

257. These allegations are corroborated by several other FE allegations. As set forth in Section IV.B.2, FEs reported that, among other things, Defendants: (i) directly presented on the Series 6 during the Company's Town Hall meetings, including presenting information regarding its watts per module, or otherwise attended the Town Hall meetings where these issues were discussed (¶¶ 124-26); (ii) reviewed documents concerning trainings and related matters required to address functional and performance issues with the Series 6 before those documents were disseminated to employees elsewhere in the Company (¶ 128); and (iii) would have been involved in, or at least known about, decisions to withhold shipments of Series 6 modules due to the modules falling short of wattage output targets (¶ 130).

### D. Defendants' Knowledge and Reckless Disregard of Misstatements Regarding Project Development

258. Defendants' knowledge of the issues facing the Project Development business is also supported by the reports of FEs. As set forth in Section IV.C.1, FEs reported that, among other things, Defendants: (i) stopped responding to RFPs and bidding on projects during 2019 (¶¶ 149-51); (ii) frequently, during Town Halls before 2019, presented on the Project Development business's pipeline but stopped presenting such information in 2019 (¶ 150); (iii) began laying off Project Development personnel in the first half of 2019 (¶ 153); and (iv) internally began to discuss the possibility of dismantling the Project Development business in late 2018 or early 2019 (¶¶ 152, 154-55).

259. Defendants' knowledge of the issues facing the Project Development business is also supported by the January 15, 2020 Barclays report, which underlined the

severity of the market loss for the Systems Segment, confirming that the business had (i) "lost 80%+ of its U.S. market share"; (ii) a dwindling pipeline that only represented 4% market share, down from previous market share figures of 20%; and (iii) "been, in large part, priced-out of the U.S. downstream solar market." The Barclays report further confirmed that the Company's share of new U.S. development projects decreased significantly between 2016 and 2019, declining from approximately 14% in 2016, to approximately 4% in 2017, before sinking to just under 2% in 2018, and then approximately 1% in 2019.

### E. The Scienter of the Individual Defendants Is Imputed to First Solar

260. The scienter of Defendants Widmar, Bradley and Antoun is imputed to First Solar given that they were high managerial agents of First Solar who reviewed, prepared, approved, furnished information for, ratified, and/or tolerated the misrepresentations and omissions.

## VIII. CLASS ACTION ALLEGATIONS

261. Lead Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of First Solar from February 22, 2019 through and including February 20, 2020, and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) members of the immediate families of the Individual Defendants; (iii) the Company's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

262. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, First Solar had more than 104 million shares of common stock outstanding and actively trading on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained

through appropriate discovery, Lead Plaintiffs believe that the proposed Class members number in the thousands and are geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

263. Lead Plaintiffs' claims are typical of the claims of the other members of the Class. All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

264. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class. Lead Plaintiffs have retained counsel competent and experienced in class and securities litigation.

265. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

- whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;
- whether Defendants made statements to the investing public during the Class Period that contained material misrepresentations or omitted material facts;
- whether First Solar and the Individual Defendants acted with the requisite level of scienter;
- whether and to what extent the market price of First Solar's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;
- whether reliance may be presumed; and
- whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

266. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all

members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

267. At all relevant times, the market for First Solar's common stock was efficient for the following reasons, among others:

(i) First Solar's common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

(ii) As a regulated issuer, First Solar filed periodic public reports with the SEC and the Nasdaq;

(iii) First Solar regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(iv) First Solar was followed by multiple securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace. Indeed, more than 150 analyst reports on First Solar were published during the Class Period.

268. As a result of the foregoing, the market for First Solar's common stock promptly digested current information regarding First Solar from all publicly available sources and reflected such information in the price of First Solar's stock. Under these circumstances, all purchasers of First Solar's common stock during the Class Period

suffered similar injury through their purchase of First Solar's stock at artificially inflated prices and a presumption of reliance applies.

269. Further, at all relevant times, Lead Plaintiffs and other members of the putative Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Lead Plaintiffs and the other members of the Class would not have purchased or otherwise acquired First Solar's common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiffs and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

270. The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

271. None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

272. To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

273. To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could

cause actual results to differ materially from those in the statement or portion thereof. As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

274. To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and approved by an executive officer of First Solar who knew that such statement was false or misleading.

275. Moreover, to the extent that Defendants issued any disclosures purportedly designed to "warn" or "caution" investors of certain "risks," those disclosures were also materially false and/or misleading because they did not disclose that the risks that were the subject of such warnings had already materialized and/or because Defendants had actual knowledge of existing, but undisclosed, material adverse facts that rendered such "cautionary" disclosures materially false and/or misleading.

## XI. CAUSES OF ACTION

### <u>COUNT I</u>

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against First Solar, Defendant Widmar, and Defendant Bradley

276. Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

277. This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder on behalf of Lead Plaintiffs and all other members of the Class, against First Solar, Defendant Widmar, and Defendant Bradley.

278. As alleged herein, throughout the Class Period, First Solar, Defendant Widmar, and Defendant Bradley, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the

facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. First Solar, Defendant Widmar, and Defendant Bradley intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiffs and the other members of the Class; (ii) artificially inflate and/or maintain the prices of First Solar's common stock; and (iii) cause Lead Plaintiffs and the other members of the Class to purchase the Company's common stock at artificially inflated prices.

279. Defendant Widmar and Defendant Bradley were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiffs and other members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

280. As set forth above, First Solar, Defendant Widmar, and Defendant Bradley made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiffs and the other members of the Class who purchased the Company's common stock during the Class Period.

281. In ignorance of the materially false and misleading nature of First Solar's, Defendant Widmar's, and Defendant Bradley's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for First Solar's common stock, Lead Plaintiffs and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiffs and the other members of the Class would not have purchased

the Company's common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of First Solar's common stock declined precipitously, and Lead Plaintiffs and the other members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Individual Defendants

282. Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

283. The Individual Defendants acted as controlling persons of First Solar within the meaning of Section 20(a) of the Exchange Act. By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about First Solar, the Individual Defendants had the power and ability to control the actions of First Solar and its employees. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs respectfully pray for judgment as follows:

A. Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Kessler Topaz Meltzer & Check, LLP and Labaton Sucharow LLP as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding Lead Plaintiffs and other members of the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D. Awarding Lead Plaintiffs and other members of the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as the Court deems just and proper.

## XIII. JURY TRIAL DEMANDED

Lead Plaintiffs hereby demand a trial by jury.

Dated: February 10, 2023

*s/ Margaret E. Mazzeo*

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Gregory Castaldo (*pro hac vice*)
Margaret E. Mazzeo (*pro hac vice*)
Joshua A. Materese (*pro hac vice*)
Alex B. Heller (*pro hac vice*)
Nathaniel Simon (*pro hac vice*)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
gcastaldo@ktmc.com
mmazzeo@ktmc.com
jmaterese@ktmc.com
aheller@ktmc.com
nsimon@ktmc.com

**LABATON SUCHAROW LLP**
James Johnson (*pro hac vice*)
Michael H. Rogers (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
jjohnson@labaton.com
mrogers@labaton.com

*Attorneys for Lead Plaintiffs Palm Harbor Special Fire Control & Rescue District Firefighters' Pension Plan and Greater Pennsylvania Carpenters' Pension Fund, and Lead Counsel for the Proposed Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP**
Salvatore J. Graziano (*pro hac vice*)
Jesse L. Jensen (*pro hac vice forthcoming*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Salvatore@blbglaw.com
Jesse.Jensen@blbglaw.com

*Additional Counsel for the Proposed Class*

**BONNETT FAIRBOURN FRIEDMAN & BALINT, PC**
Andrew S. Friedman (005425)
2325 East Camelback Road, Suite 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
afriedman@bffb.com

*Liaison Counsel for Lead Plaintiffs and the Proposed Class*